EMILY P. RECTOR

v.

JOSEPH M. RECTOR.

[Decided January 26th, 1911.]

1. Evidence in a divorce suit *held* insufficient to show extreme cruelty by the husband.

2. Evidence in a divorce suit *held* insufficient to show adultery by the husband.

3. Evidence *held* insufficient to show desertion of the wife by the husband.

4. Evidence *held* sufficient to show wife's desertion of husband.

5. A spouse's guilt of adultery can be inferred from desire and reasonable opportunity.

6. A physical departure from a spouse is not essential to desertion.

7. To constitute desertion, there must be cessation of cohabitation, an intent to desert and desertion against the other's will.

8. Unjustified refusal of one spouse for the statutory desertion period to have sexual intercourse with the other, and withdrawal from other marital duties against the other's will, constitutes desertion, though they continue to reside in the same house.

Heard on petition and answer, cross-petition and answer and proofs in open court.

*Messrs. Peter & John Bentley* and *Mr. John I. Weller,* for the petitioner.

*Mr. Merritt Lane,* for the defendant.

GARRISON, V. C. (orally, after argument of counsel).

As the taking of testimony in this suit and the arguments of counsel have now consumed eleven days, I am better able to dispose of the case at once, while fully in possession of all of the facts and informed of counsel's views respecting each of the questions raised, than would be the case if I delayed rendering a de-

cision until such time that I had to review the testimony and the arguments.

The initial petition in this cause is by the wife for a limited divorce on the ground of extreme cruelty. It was filed on the 18th of November, 1909. Subsequently, she amended and supplemented this so as to allege adultery between her husband and a Mrs. Rhea Smith, subsequently intermarried with a man named Magee; and, also, in the same amended and supplemented petition, alleged desertion on his part for more than two years then last past; and thereupon prayed for an absolute divorce upon those grounds.

The answer of the husband denied the allegations of the wife's petitions, and by cross-petitions prayed for an absolute divorce on, first, the ground of desertion since October 1st, 1907, and second, adultery with John H. Winans upon various stated occasions.

The defendant is now about forty-three years of age and the wife thirty-eight. They are gentle people, he being a physician with a good practice, and she the daughter of a lawyer of standing and means. They were married in 1895, and have had three children—Dorothy, now about fourteen; Emily, now about eleven, and Joseph, now about six. There is no dispute that up until late in the year 1906, or early in 1907, they got along together in a manner which requires no comment. They lived in a good neighborhood, on the corner of York street and Jersey avenue, in Jersey City, in a nice house, and were acquainted and associated with nice people.

Some time in the early part of 1907 their disagreements began, and continued with increasing frequency and seriousness until the bringing of this suit by the wife in November of 1909. It is extremely difficult to ascertain and determine just what instigated the disturbances, which began early in 1907. Up to that time Mrs. Rector and the doctor seemed to have been kind and pleasant to each other, and to have had no cause of complaint one against the other. Beginning at that time the wife altered her previous manner and conduct toward her husband and the general family life. She says that it was on account of the acquaintance and conduct of the doctor with Mrs. Smith. The latter was a woman

of good family, a widow, who lived with the Detwillers, who were life-long friends of Dr. Rector's, and she was a patient of his. There is no allegation made by the wife of any improper conduct by the doctor toward Mrs. Smith so early as the spring of 1907; but I believe that Mrs. Rector's conduct at that time was partially, at least, referable to her state of mind concerning Dr. Rector and Mrs. Smith. There does not appear from the proofs to have been any ground for her believing in the existence of any wrongful relations between her husband and Mrs. Smith, but I believe that she was jealous of her husband in respect to Mrs. Smith. However this may be, it is the fact that from that time Mrs. Rector ceased being pleasant to the doctor, little by little eliminated him from her daily life and doings, and came and went pretty much as she pleased without considering his desires or how her conduct affected him. She does not appear to have directly charged him with any wrong-doing, but, by her conduct toward Mrs. Smith, who had been an acquaintance, if not a friend, of hers, she showed that she was aggrieved at or because of her. The doctor says she never spoke to him of Mrs. Smith excepting in a similar manner to that in which she frequently, if not always, spoke to him concerning his women patients. She seems to have been curious, if not suspicious, of his relations with all women with whom he came in contact and treated professionally.

From Mrs. Rector's own testimony it is obvious that from a late period in 1906, or a very early period in 1907, she determined to give herself more freedom as to coming and going than before; and she certainly, after that time, largely, if not entirely, sought her associations and recreations apart from her husband. She did not express in words her grievances, but acted as if she was either aggrieved or angered, or both, and repelled any advances by him looking toward reconciliation and resumption of their previously happy married existence. When he requested information as to her whereabouts, when she had been absent, she refused to talk to him; and if she volunteered any information as to where she had been, it was upon the few occasions when her companions indicated to him whence she had come.

The defendant undoubtedly was angry at her conduct, and it undoubtedly affected his manner and conduct toward her.

There were no physical encounters of any kind during this period, and nothing which by any possibility could be brought within any proper application or construction of the term "extreme cruelty."

In July of 1907 Mrs. Rector and the children went to the Hotel Calderwood, at Oakland, New Jersey. While there she met a Mr. Winans, who was accustomed to make that place his summer headquarters. He is a lawyer by profession and apparently a man of means, having horses, carriages, opera boxes and other *indicia* of wealth. Upon the occasion of a visit there by the defendant he became jealous of a preference which he thought his wife showed as between his company and that of Mr. Winans. She returned from Oakland in the early part of September, 1907, and they resumed living at the York street residence much in the same manner as that which had preceded her visit to the country. Mrs. Rector continued to conduct her life in about the same way as before her departure for Oakland, except that possibly she went out in the evenings more frequently to gatherings or amusements apart from her husband, and more thoroughly and absolutely withdrew from the family life, and eliminated herself from his life and excluded him from her life. She still refuses either to abstain from going out at his request or to give information concerning her doings while out. While the parties, up to the fall of 1907, still kept up a semblance of being united, it was little more than a seeming.

Mrs. Rector says that it was in December, 1906, that she saw Mrs. Smith leave the doctor's office and go toward the ferry, and later saw the doctor also go toward the ferry, and that she went there also and saw Dr. Rector and Mrs. Smith sitting on the upper deck of a ferry-boat together, and that she spoke distantly to them, whereupon Mrs. Smith, she says, made protestations of innocence and left the boat, and she and the doctor went on to New York together. Mrs. Smith and Dr. Rector deny all suggestion of protestations by Mrs. Smith, and say that their meeting upon the boat upon this occasion was entirely by accident and was without motive or purpose. The doctor places this incident much later, and says that it was his clinic day, upon which he always took the ferry-boat, leaving at that time to attend at a

medical college in New York where he held the chair of gynæ-cology; that the meeting between him and his patient, Mrs. Smith, was entirely accidental, and that Mrs. Rector's conduct was inexplicable to him, and that afterwards he informed her that if she treated Mrs. Smith badly he would lose the Detwiller family, of which Mrs. Smith was a member, and which was one of his best paying families. However this may be, it is true that Mrs. Rector, in the fall of 1907, practically alienated herself from the doctor and eliminated him from all intimate and familiar contact with her, both parties agreeing that, from a date in October, 1907, all sexual relations between them ceased; and it is proven to my satisfaction that this was caused by Mrs. Rector's refusal; and that, although often afterwards requested, she always refused to resume such relations.

There were clashes arising from her refusal to either consult him about her comings and goings, or inform him concerning them.

In November of 1907 a further matter of disagreement arose out of the attitude and conduct of the Rectors toward the unhappy conditions existing in the family of her sister, Mrs. Warren Dixon. The name of a Mr. Aiton had been connected unfavorably with that of Mrs. Dixon, and Dr. Rector did not wish his wife or her sister Miss Eugenia Bentley (who was then an inmate of his household) to interfere in any way, and upon finding that they were conniving at communications through his house between Mrs. Dixon and Mr. Aiton, he forbade it, and this caused further bad feeling. Later, in that same month, a family gathering of the Bentleys at the Rector home culminated in an unseemly fist fight between Parker Bentley, a brother of Mrs. Rector, and the doctor; the police were called in by the doctor, and Parker was arrested, and subsequently released by the doctor withdrawing the complaint. The doctor ascribes this trouble to too much drinking. I think the real cause was some conversation he overheard between his wife and her brother concerning her grievances against him, the doctor, in which he was held up by her to her brother in an undesirable and unpleasant light. However, the result was the ejection of Miss Bentley from the house, and an increased bitterness between the husband and wife.

Matters did not mend at all, but, if anything, grew slightly worse between them. In October of 1907, as previously stated, all marital intercourse between these parties had ceased.

Shortly after Mrs. Rector's return from Oakland, in 1907, she received some letters from Mr. Winans, one of which contained but a few lines and some photographic films. This letter she either showed to the doctor, or informed him of its contents. The others she did not. She asked the doctor if he would accompany Mr. Winans and herself (and, I think, Miss Bentley) to the opera box of Mr. Winans at the Metropolitan Opera House, and he refused. She wanted to ask Mr. Winans to come to her house to dinner, and he forbade her to do so, and instructed her to tell him that she could not have him at her house, and this she did by telephone and later by letter.

He found certain letters from Winans to his wife in her desk and quarreled with her about them. This was in October of 1907, just before the cessation of all marital intercourse.

Nothing requiring specific relation occurred until the summer of 1908. After disagreements between them as to where and when she should go for her vacation, finally in August she went to Oakland, he having, upon learning that she intended to go there, forbidden her to go to that place because of his knowledge that Mr. Winans usually went there in the summer, and he did not wish her to meet Winans. She had received about $500 from some dead relative's estate, and, feeling secure as to money, went, taking a maid and her three children.

Previously, and in July of 1908, she began to go to the office of Mr. Winans in New York, and to consult and confer with him about her marital troubles, and to be guided by his advice in respect thereto, and on the 24th of August she gave him a check for $100. This was a part of the $500 she had which has just been referred to. She at one time conveyed to Mr. Winans the information that of this $500 she had $300 left, and he advised her to deposit this in a bank in New York, which she did; and the first or second check that she drew against this deposit, on the day on which she made it, the 24th of August, 1908, was to Mr. Winans for the $100 aforesaid, which they both

testify was a retainer paid by her to him to secure his legal services in her marital troubles.

Upon learning that Mrs. Rector had gone to Oakland, and that she would probably stop while there at either the Calderwood Hotel or at the cottage of some people named Lockwood, he wrote to both places, warning them that he would not be responsible for her debts at these places because he had forbidden her to go there. Mrs. Rector stayed at the Lockwood cottage from August 13th to September 4th or 5th, the Sunday before Labor Day of 1908. Winans was frequently at Oakland, stopping at the Calderwood Hotel, upon part of the grounds of which the Lockwood cottage stood. He and Mrs. Rector met constantly, conferring, they say, about her marital troubles. She had informed Mr. Winans that the doctor had found some of his letters to her and had made a scene concerning them.

She arrived home the Sunday before the doctor left for his hunting trip of 1908, and she stayed in the house until after this suit was brought. At the time of her return in September of 1908, her room on the second floor was being refurbished, and she went, at the doctor's direction, to the third story, and stayed there so long as she remained in the house, refusing to go back to her room on the second floor, or to permit the children to resume their old quarters on the second floor.

The doctor provided for the family meals at boarding-houses in the neighborhood, and they never afterwards resumed full family life together, although they lived under the same roof and met and spoke together occasionally and formally.

Mrs. Rector began going to the office of Mr. Winans to consult him, she says, about her marital troubles, in the month of July, 1908, and continued to visit him there until she went to Oakland on the 13th of August, he going there then also. At Oakland, whenever he was there, their constant private interviews excited the comment of one of their mutual friends, who suggested to Mr. Winans that it was subjecting them to a misconstruction, unless he explained to those who observed them that he was her lawyer, and that their constant private interviews were with respect to legal business.

Harriet Bird, the maid whom Mrs. Rector took with her to look after the children, says that Mrs. Rector frequently took long walks at night in the woods near the cottage where Mrs. Rector lived. They deny this. She relates one occasion when Mrs. Rector left on the morning train and did not return upon the latest evening train, and did not come to her bedroom until daybreak, and says that upon this occasion she thought she heard Mr. Winans' voice. They deny any such occurrence.

Mrs. Lauterbach, a friend and associate of theirs at Oakland, whose family lived in the village, says they were frequently together; that she saw them kissing upon one occasion. They deny that they ever kissed each other. Mrs. Lauterbach says they took walks together, which they deny; and that she saw them in a room apart, late at night, in a familiar attitude toward each other. They deny this. She says that upon another occasion she came across them upon a dark porch of an inn where they had come to dine with a party, and that they had left the rest of the party quite some time before she stumbled over them upon the porch. They deny this.

Upon the occasion that Mrs. Rector was upon this visit at Oakland, she returned to the Jersey City residence to get some things. She met the doctor there and was invited by him to stay to luncheon, and refused to do so, and went from there to New York, met and lunched with Mr. Winans, and returned with him to Oakland.

Upon Winans' advice, and so as to prevent a successful charge of abandonment by her of the doctor, she returned to the Jersey City residence the day before she had been informed the doctor intended leaving for a hunting trip to Canada. She got back upon Sunday night, and he left the following Monday morning, September 6th, 1908. He left her $25. She says she was in great want and that the children were also.

On the 25th of September, 1908, she went with the boy, Joe, who was about four, to Niagara Falls, returning on the 27th. She did not inform the doctor of this trip. She sent the two girls to a friend. The boy subsequently informed his father's sister that he and his mother had taken this trip, and that Mr. Winans was with them. Upon learning that the boy had done

this, the petitioner told him that he had dreamt it. The child was produced, sworn and gave evidence. It is difficult to make out from it whether he firmly believes that he saw Mr. Winans or dreamt that he saw him. Mrs. Rector and Winans deny any such occurrence.

Through the rest of the year 1908 she frequently met Mr. Winans at his office and went with him to restaurants and hotel dining-rooms. They do not deny that they were at the places where detectives and others saw them, but they insist that their meetings were for the discussion of legal matters requiring attention.

In January of 1909, several detective witnesses testify to an occurrence at Winans' office when Mrs. Rector was there, and all the lights were extinguished and they stayed in a dark room together for about half an hour. They admit that they were there, but they deny the putting out of the lights. They confirm the rest of the detectives' stories concerning their whereabouts after they left the office, and their going to a restaurant in Brooklyn where they dined together and subsequently came to Jersey City, where she went back to the Jersey City residence.

Many other similar dinners and meetings are testified to by the detectives and admitted by Mrs. Rector and Mr. Winans. They were together at lunching places downtown and uptown, and in dining-rooms and restaurants and hotels, both uptown and downtown. They met at his offices, upon the street, upon elevated railroad platforms and at railroad stations. They went to Newark together, to Summit, to Elizabeth and Jersey City, upon all of which occasions they say that their reason for meeting and being together and remaining together was to discuss her legal affairs. The detectives, who watched them upon the occasion of a meeting at the Delaware, Lackawanna and Western depot at Hoboken, say that after dining there (which they admit they did), Mr. Winans placed his arm around Mrs. Rector on the way down from the dining-room to the ground floor. This occurrence Mr. Winans and Mrs. Rector deny.

In March of that year they met one afternoon at the Hotel Manhattan in Forty-second street, New York, and after taking afternoon tea, or having something to eat or drink together there,

they then walked by way of Central Park to his apartments in West Eighty-fourth street in the city of New York. She had never been there before, they say, but upon one occasion, and upon that occasion had not gone inside. She came there on that first occasion, they say, in a taxicab with Mr. Winans and a Mr. Pelletreau, and they explain that Mr. Pelletreau was being asked to loan her some money upon her share in her father's estate, and that he and Mr. Winans talked business in the apartment while she sat in a restaurant around the corner, and that subsequently Winans dined at this restaurant with her, and after dinner took her to the ferry-boat for her to come back to Jersey City. Upon the second occasion they say they were going there to see a Miss Small and endeavor to get her to do some detective work for Mrs. Rector. Their story about this is not very convincing, and the relationships existing between Winans and Miss Small are rather difficult of comprehension under all the circumstances in evidence concerning them.

The colored boy who was on duty at the apartment seems, by his evidence, to suggest, if not possibly to swear, that Miss Small was not there at all upon that occasion. They say she was there, and she says she was there.

The meetings at his office and other places, as above described, continued without interruption or particular incident until April, 1909. On Saturday, the 3d of April, 1909, she went in the afternoon, with her daughter Dorothy, a child then of between twelve and thirteen, to Mr. Winans' apartments. The implication conveyed by the colored boy that they were there with Mr. Winans for some period of time before a Mrs. Lockwood arrived, is denied by Winans and by Mrs. Rector. Mrs. Lockwood, and later her husband, and Mrs. Rector with her daughter, and Mr. Winans were all finally together at his apartments on that evening or afternoon, and dined together and remained together until about ten-thirty or so, when Mr. Winans took Mrs. Rector and her daughter to the ferry-boat. They explain that this was really a long-promised house party by Mr. Winans to the Lockwoods and Mrs. Rector, but that it was also availed of, and particularly so, as an occasion to get Mr. Lockwood to consent to go to a house in New York where they thought they had

reason to believe that Mrs. Smith lived, and ascertain whether she lived there.

Upon the return of Mrs. Rector and Dorothy to the Rector residence, about eleven-thirty on this Saturday night, Mrs. Rector refused to give the doctor any information as to where she had been, but the child informed him, and he thereupon became very angry and abusive of Mr. Winans, and absolutely forbade any association of any sort between his wife and Mr. Winans.

She had promised to return to the Winans apartment on the next day and dine again with the Lockwoods, and after this scene with the doctor she next day called Mr. Winans on the telephone at his apartment and conveyed to him information of what had happened, and told him that she would not come over under the circumstances. He, however, persuaded her to come, telling her that it was only right that she should renew her efforts to obtain Mr. Lockwood's services in hunting up Mrs. Magee or Mrs. Smith, and that since the doctor was endeavoring to do things detrimental to her, it was only right that she should continue to do things detrimental to him, and that she should come, which she did. She got there between two-ten and two-thirty upon that Sunday afternoon. The Lockwoods were there and Mr. Winans was there, and they had dinner, and later in the afternoon Dr. Rector arrived with Thompson, one of the detectives employed by him, and they obtained admittance to the apartment, and a disturbance and scene ensued in which the doctor accused Winans and his wife, and the police were telephoned for, and the doctor and Thompson departed, and subsequently Mrs. Rector got back to Jersey City, and the next day was brought to the house of her brother John, and the doctor was interceded with concerning her return to her home. A rather inconclusive meeting was held between John and the doctor as to the terms upon which she would be re-admitted. In the meantime she was re-admitted, and remained there until a long period after the beginning of this suit.

From that time the condition of the contending parties may be properly described as one of "armed neutrality." There is not the slightest suggestion that anything that was done by

either after that was not practically a tactical move in the open warfare that had existed and that was still smoldering.

It is the petitioner's contention that the various happenings up to the time that she filed her bill demonstrate that the conduct of Dr. Rector toward her was extreme cruelty under the construction placed upon this term by our courts, so as to bring the case within the statute.

I am utterly unable to reach this conclusion.

There is only one instance in all of this long and minute recital of family life in which there was any physical violence of any sort, and that was of the most casual character and did not in any way reveal any cruelty upon the doctor's part, or the possession by him of a cruel or brutal disposition, or of anything approaching it or approximating it. This incident happened on Thanksgiving Day of 1908. For some time prior to that period she had been removing certain articles from the house—whether they belonged to her or to the doctor is utterly immaterial. Some time before that time he had made up his mind to stop this, and had locked portable articles, which he did not propose to have removed, in the dining-room. The parties were not eating at home. It was after her return from Oakland, and after that time she never ate in the house but always at boardinghouses. There was some picture which she claimed to own, and which he did not propose that she should have—whether she owned it or not I do not know—and he was about to put this into the dining-room. She objected, and followed him into the dining-room and took the picture up for the purpose of taking it out again. It was a small affair. He wrested it from her hands and took her in his arms and carried her or pushed her out of the room. She returned to the room again and persisted in her endeavor to remove this small picture from the table or chair, or wherever he had put it, and he would not permit her to do so, and again put her out of the room, and eventually forced her down upon a sofa and held her there. This is the only thing throughout the case, which is credible, which in any way indicates any physical encounter between these people, and it is really too trivial to dignify by any great amount of discussion.

She has an allegation, which she persists in, that he exhibited cruelty toward her by some medical treatment in June of 1907. She now insists that at that time he performed an abortion upon her. I do not believe this. I think that she was being treated by him for quite a period for some woman's disease or trouble, and that she had simply seized that as an occasion around which to construct this story of an abortion. She does not even suggest that she knew she was pregnant upon that occasion, and says she did not get the idea into her head for many, many months afterward that this was an abortion, and that he told her so. I do not believe this. I think that is something born of what Chancellor McGill once called "defensive ingenuity."

Apart from these two physical instances there is nothing in her case concerning extreme cruelty excepting her complaints concerning the doctor's conduct toward her during this long period. That conduct, she says, consisted in not giving her as much money as she thought she should have, in forbidding her to associate with friends in the way that she wanted to, and in other similar instances.

While there is tremendous volume in these complaints, the result of a careful analysis of the testimony is so small that it hardly seems to require extensive treatment, and I shall not devote any more time to it. I cannot, as a conscientious trier of fact, say that I have any doubt that the offence of extreme cruelty has not been made out by the petitioner.

With respect to her charge that Dr. Rector was guilty of adultery with Mrs. Smith, the proven facts are few, and are properly summed up as follows: The petitioner says that the doctor met Mrs. Smith some time in the year 1906; that she observed that he was taken with her; that upon several occasions the doctor either put her on the right hand when she thought Mrs. Smith should have been on the left, or put her on the left when she thought Mrs. Smith ought to have been on the right; and that upon some other occasion she thinks the doctor either did not dance enough with her, or danced too much with Mrs. Smith, or some similar complaint. That the doctor was treating Mrs. Smith as a *bona fide* patient there cannot be any possible question. She had injured her leg in such a way as to affect the

bone, and it became necessary subsequently to have the leg operated upon twice, and each of these operations was performed by Dr. Rector. Mrs. Smith was an inmate, as has previously been said, of the Detwiller home, and they are people of the highest respectability in Jersey City and had been life-long friends of the doctor and his family, and were among the very best paying families that he had. Were it not for the testimony of a servant girl in the home of Detwiller there would not, apart from Mrs. Rector's testimony, be the slightest trace of any implication of impropriety between Dr. Rector and Mrs. Smith which need be considered. The testimony of this girl, Julia Scott, is that for a period of months in the year 1907 she was a servant in the house of the Detwillers, and that upon three occasions, when all of the other members of the family were absent but the servants were at home, Dr. Rector called at the house and saw Mrs. Smith; that upon each of these occasions they spent the entire time that the doctor was there (which was a considerable period) in what was called the "den," which was a room off of although practically a part of the dining-room; that upon each of these three occasions, from a point of vantage which she describes, she heard or overheard that which happened, or some of the things which happened between them; that she heard them kiss, she heard endearing names and she heard Mrs. Smith tell Dr. Rector that "Mrs. Rector was not the wife for him." On one of these occasions when she heard these things she was at the door of the pantry, which was very close to the "den," and from which if she could have seen the "den" they could have seen her. Upon the other occasion she was on the third step of the stairway of the front hall and so far removed from the "den" that it seems almost impossible that she could have heard what people said who were in there and utterly impossible, I should say, to hear kissing, unless the latter were done in a spirit of burlesque and for the purpose of making a noise.

When it is considered that Dr. Rector is not shown by any witness to have had any previous intimate relations of any sort with Mrs. Smith (I do not use the word "intimate" in a sexual sense)—when it is considered that the Detwillers were life-long friends of his, were among his best paying patients, were right in

the midst of the place where his practice had to come from if he were to continue in this community—that this was their house—that she was their guest—that the servants were all in the house, and it was in a room which opened out of and was almost a part of the dining-room, which was the thoroughfare from the kitchen regions to the front of the house, where the front door was and the front stairs—that this was early in the evening and the servants were naturally stirring about—it is inconceivable to my mind that he would have imperiled his entire future for the slight gratification that these exhibitions of affection under these circumstances could have given him.

There is not in this case sufficient evidence to satisfy any of the definitions that I have found concerning what amounts to proof of adultery which would enable me as a conscientious trier of fact to reach the conclusion that Dr. Rector committed adultery with Mrs. Smith.

This leaves, so far as the petitioner's case is concerned, the sole remaining question of the charge of desertion.

She alleges that for two years prior to the time that she filed the petition in which she alleges desertion the doctor's conduct amounted to willful, continued and obstinate desertion of her. It is extremely difficult to determine upon what she bases such a charge; because there is no evidence in the case that she ever desired to resume marital relations and he refused. There is evidence that she constantly objected to not having her own way concerning whatever she desired to do, and objected to his not giving her as much money as she thought she ought to have. There is evidence that from a period in 1907 these two people, while they lived under the same roof, did not live as husband and wife, not only as to sexual intercourse but as to any other of the things that distinguish married life from mere existence under the same roof. There is no evidence that this was initiated or continued by the conduct of the doctor. I am not, therefore, able to find the defendant guilty of desertion, and I do not think it worth while further to discuss the charge of desertion as made by the petitioner.

The first question which I shall consider upon the part of the defendant and cross-petitioner is with respect to the allegations

of adultery between Mrs. Rector and Winans. I have sufficiently stated in my preceding *résumé* of facts the general line of conduct between these people. The sole question is whether or not there is sufficient proof in this case concerning their conduct to lead this court to find that they were guilty of adultery. I, of course, do not search the proofs with the determination that I must find some instant of time, at some specific place, where this crime is demonstrated to have been committed. I realize that the law of this state is that the guarded discretion of a reasonable mind must approach this matter and continue to investigate until it is satisfied that, by excluding proper inferences of innocence, that of guilt alone remains. I also realize that I must approach these proofs and continue considering and analyzing them until I have found, before I can find guilt, two things —*first,* desire; and *second,* a reasonable opportunity to gratify the same. Upon the conjunction of these two findings the inference of guilt may result.

In *Osborn* v. *Osborn (Court of Errors and Appeals, 1888), 44 N. J. Eq. (17 Stew.) 257,* where numerous suspicious circumstances were considered by the court, it refused to reach a verdict of guilty because it did not find itself satisfied that these two things had been proven to have existed together. The difficulty with the case at bar—and I admit that it is a very great one—is to satisfactorily explain the conduct of these people upon any reasonable hypothesis which satisfies me either that it was innocent or that it was guilty.

It is undoubtedly true that Mr. Winans was a lawyer, and that Mrs. Rector did talk to him about her troubles; but I cannot believe and I do not believe and I shall not find that she and he tell the truth when they say that during all these five or six months that their constant meetings took place, that their interviews at his office, on the street, on the elevated railroad platforms and trains, and on ferry-boats and in ferry-houses, and visits to Summit, and to Elizabeth, and to Newark, and Brooklyn, and Jersey City, and their walks through the streets and parks, and in their visits to his home were upon legal business, or were necessary or are reasonably to be explained upon that suggestion. It is undoubtedly true that they did, at their meetings or some

of them, or at some part of all of them, talk about her troubles; but no one could hear this testimony with an open mind and reach the conclusion that their conduct is explicable upon any theory that their sole relation was that of attorney and client.

Of her impropriety in seeking this particular man as her law-. yer there can be no question, and no occasion for me to dwell upon.

· Upon her indiscretion—which is almost unbelievable unless it were demonstrated by her own and his testimony—there is no occasion further to dwell.

To characterize a lawyer who would permit a client to conduct herself as she did, even if she had not better sense as to her own conduct, there is no occasion for me to search for words.

But when all this has been said, and when the most severe condemnation has been visited upon their conduct, the question still remains, is there in this case sufficient proof that the association of these people was for a sexual purpose? In other words, can we find from the proven facts that they had a sexual desire one for the other; and that upon some of the opportunities which they had they gratified it?

The only evidence upon this subject which the most careful watching to which they were subjected has resulted in being brought before me relates, as I now recall it, to three occasions.

Sophia Lauterbach, an associate and friend of theirs, who was with them at Oakland, says that she, upon one occasion, saw them kissing. She does not and was not asked to give any details. We know nothing whatever of the circumstances. We have simply that bald statement. She also says that upon another occasion she saw these people in the dining-room of the Lockwood cottage when the rest of the party were in the living room, and that he was leaning over her (Mrs. Rector), and that Mrs. Rector was sitting on a box, and I think the general implication of this testimony is that there was something improper in their respective positions toward each other at that time. This was in the summer of 1908.

The colored hall boy at the Winans apartment on Eighty-fourth street testifies to looking through a transom (which Winans and Miss Small say was covered with a heavy piece of

cloth and could not be seen through), and to have observed Mrs. Rector sitting upon Mr. Winans's lap. He places this upon Palm Sunday afternoon, when all the rest of the testimony in the case convinces me that the apartment had at least three other people in it, and perhaps four.

The other instance is testified to by two of the private detectives hired by Dr. Rector, and concerns a happening after a dinner which these people took together at the Delaware, Lackawanna and Western station one night. Upon leaving the dining-room at some hour around eight in the evening they say Mr. Winans put his arm around Mrs. Rector while she was going down the stairway. As this was one of the most public places imaginable, in a very busy railroad station and on a broad and observable and highly lighted stairway, this seems to be a very remarkable thing for this man to have done under the circumstances. The note which the detective Thompson made of this incident in his note-book is unquestionably interlined—that is, written in there after the original account of what happened was completed.

These are the sole instances which now occur to me, and I think they are all that the proofs disclose, of any physical contact of any description of a lascivious nature, or of an intimate nature, between these people throughout a period when they were under espionage, and were, as the proofs show, very frequently, if not constantly, observed by watchers on behalf of the defendant.

I have said sufficient to indicate the balancing factors which are now and throughout the giving of the testimony in this case have been in my mind.

I am not sure how I should determine this issue if I felt compelled to determine it. I do not. I find that the other allegation, which concerns the desertion which the cross-petitioner alleges was committed by Mrs. Rector, is proven; and, therefore, since I base the decree, which I shall advise upon that ground, I do not find it necessary to express any judgment or verdict with respect to this other allegation.

I have indicated in a previous portion of this deliverance that I reach the unquestioned conclusion, after considering carefully

all the evidence, that from at least the fall of 1907, Mrs. Rector had firmly made up her mind to cease all marital relations with Dr. Rector, except the bare living under the same roof with him and accepting from him such support as he was either willing or could be induced to give her. Realizing that this case is unlike a great majority of desertion cases, I have pondered over it long and carefully, and have not reached my conclusion upon the law without the most careful deliberation of which I am capable. Now, that I have reached it, I cannot say that my mind is any longer in doubt.

By way of preface upon the question of the law, I think it useful to say that I incline to think that one of the difficulties in a clear apprehension upon this question of desertion arises rather out of the difficulty of proving desertion by any other fact than actual abandonment or departure than out of determining what is essentially desertion. Since in the vast majority of cases the only way to prove that the offending spouse intended to desert is an actual departure of that one from the other, a physical going away from and abandonment, it has almost come to be believed that a physical departure, going away from, utterly ceasing to be within sight of the other, is an essential element of the offence. I do not believe that it is, either by precedent, definition or reason. I know of no more satisfactory definition is this state of the statutory offence of desertion than that contained in *Sergent* v. *Sergent, 33 N. J. Eq. (6 Stew.) 204* (at *p. 205*). It is there defined as follows:

"To establish desertion three things must be proved—*first,* cessation of cohabitation; *second,* an intent in the mind of the defendant to desert, and *third,* that the desertion was against the will of the complainant."

With respect to the first and third of these essentials we have no difficulty in this case whatever. The unanimous testimony of the parties is that there was a complete cessation of all matrimonial cohabitation from a period dating back to October, 1907. With respect to the third, there is practically no dispute, namely, that that which I hold to be desertion was against the will of the husband.

The real question is, therefore, with respect to the second—Did Mrs. Rector intend to desert her husband? This, of course, depends upon what this court shall properly find to be included, bound up in and meant by the word "desert."

It has been held both in England and in this country, and in this state, that a man has deserted his wife even though he continues to supply her with all the necessaries of life. Conversely, why should it not properly be held that a wife has deserted her husband if, withholding all other marital obligations and relations, she continues to accept support? And this is practically all that Mrs. Rector, after October, 1907, did.

Whatever may have been the result of a study of the decided law in this state prior to the decision of *Raymond* v. *Raymond* (unreported), by the present chancellor, it is now quite clear that this decision has clarified and settled the law upon what may have been theretofore a doubtful point. In that case the proofs were that the parties were married and lived together for quite some time, the husband absolutely refusing to have intercourse with the wife. Upon her complaint, he refused to have intercourse with her. She withdrew from his house and went back to her father's home, and at his instance returned to her husband and again requested this matrimonial relation, which he again refused. She thereupon left him and sued for divorce after the statutory period had passed, and was held to have made out the offence of desertion. The chancellor, who signed the decree, did not himself write any opinion, but, of course, the necessary rule which the facts must have applied to them to have produced that decree becomes the law of the state, so far as the court of chancery has to do with declaring that law. The case had been referred to former Justice Van Syckel, than whom, of course, there is no jurist of higher repute in the state; and in a memorandum filed by him at the time of his report he cites many authorities with approval, and, among them, that which he says contains the kernel of this matter:

"In *Stein* v. *Stein, 5 Colo. 56,* the court said 'matrimonial cohabitation must certainly comprehend a living together as husband and wife, embracing relative duties as such, otherwise all married couples residing in a hotel, boarding or lodging-house

might be said to be cohabitating promiscuously.' And in that case the court held that desertion commenced when the husband refused to have intercourse with his wife, although he lived in the same house with her, at the time."

After citing American and English cases and text-books which satisfied him as to what the rule was, he concludes by saying:

"The cases generally admit that unjustifiable withdrawal from marital cohabitation constitutes desertion.

"That marital cohabitation implies necessarily something more than merely living under the same roof is strikingly stated in the quotation before made from *Stein* v. *Stein*.

"Where will the line be logically drawn, unless it is held that to constitute matrimonial cohabitation it must include the duties which distinguish the marital from every other contractual relation? When cohabitation, in its true sense in the marriage relation, ceases, desertion commences."

Mr. Justice Van Syckel then proceeds to state that he has not overlooked the two cases in the court of chancery of New Jersey which bear upon the issue, and he points out that in *Reid* v. *Reid (Chancellor Zabriskie, 1871), 21 N. J. Eq. (6 C. E. Gr.) 331,* the chancellor did not refer to the authorities which existed upon the subject, and that it appeared in that case from the testimony that the parties were married in 1841 and lived together until 1862, during which time two children were born of the marriage; and so far as appears, the husband, after he left the wife, did not offer to return or make any request for the renewal of his marital rights. And with respect to the case of *Watson* v. *Watson,* which is reported in *52 N. J. Eq. (7 Dick.) 349,* as anonymous, Chancellor McGill held that the fact that the wife withdrew from sexual intercourse with the husband did not constitute desertion within the meaning of the statute; and he points out that in that case the chancellor found as a fact that the husband, who was the complainant, never sought a restoration of his marital rights; and he thereupon proceeds thereafter to point out what he calls the distinguishing features between these cases and the rule which he finds is sustained by the various text-writers and other authorities that he gives.

In my view the true rule, as abstracted from the cases and the text-books, and from reason and authority, is that wherever one spouse, without justifiable reason, refuses for the statutory period to have sexual intercourse with the other, and withdraws from all other marital duties than merely living under the same roof in the same relationship that could exist between a man and his housekeeper or a woman and her boarder—a condition in which the fact that she is the wife or that he is the husband is of no consequence whatever in their relation and method of living together—the desertion exists, and the one who has caused this situation against the will of the other is the offender. To hold otherwise, it seems to me, means to place it in the power, under the law, of either spouse to actually break the contract of marriage and suffer no consequences whatever. To say that they do not break that contract when they absolutely deprive marriage of any of its essential and distinguishing characteristics from all other contracts is to use words without meaning. If it is not a breach of the marriage contract for a woman to refuse all intimate—not sexual—relations with her husband—to make her associations entirely outside of him and his—to refrain absolutely from going anywhere with him under any circumstances—to carry on no conversation with him excepting when absolutely necessary and then in the most formal manner—to refuse to have any sexual intercourse with him at any time or under any circumstances, and to eliminate him in every way possible from her life and exclude him therefrom—then I do not see how desertion can mean anything else than absolute abandonment; and our courts have always held that it does not mean abandonment; that while abandonment is desertion, desertion is something much less than abandonment.

I shall not at this time amplify this idea further, but shall proceed briefly to indicate the application which I think should be made of this principle to the existing facts.

I think that undoubtedly Mrs. Rector, in the early part of 1907, actuated, as I have before suggested, probably by her attitude toward Dr. Rector and Mrs. Smith, determined never again to have any relations whatever with the doctor such as a wife should have—not merely sexual, but any relations. She an-

nounced this to him—that is to say, she told him plainly when he
sought to obtain from her some reason for her stand-off attitude,
and to cause it to come to an end if he could, that this was not
a sudden thing; that it was the result of a long series of things;
that she was done; that the feeling that she had for him at the
time of her marriage was dead and never could be revived, and
that she would continue to do what was right by him, but it was
to be what was right in view of this situation. No wife could
any more plainly say to a man that "from this time forth I do
not purpose being a wife to you" than she said upon that occa-
sion. And I must say, to her credit, that she certainly was con-
sistent. She never, after that time, by word, look or deed, to him
or to anybody else, in the slightest degree changed her mind or
her course; and she said to him and to other people that she was
not living with him as a wife and never would. She eliminated
herself absolutely from his life from that time on, excepting as
a person who was under his roof and must be supported. She
sought her associations entirely outside of him; she would not go
anywhere where he was to be; she would not accompany him any-
where; she did not even let him know where she was going so
that he could even offer to accompany her; she refused to tell
him where she was going, or where she had been, or where she
intended to go. In fact, I cannot recall that, except the living
under the same roof and the eating at the same table, they had
anything more to do with each other as husband and wife than
if they had actually lived in different states. They certainly had
no family intercourse; they did not talk about their lives or
their children or themselves or their neighbors, or anything
else; they certainly did not have any sexual intercourse—upon
that they are both agreed; they certainly had no family life of
any kind or sort; and if all this, taken together, does not con-
stitute desertion, then it must be because desertion in this state
must be held to mean absolute abandonment, a going away from
the place where the other one is. That it does not mean this—
that it will not do for us to contract its meaning to that, I am
firmly convinced. I am satisfied from the authorities which I
have briefly reviewed, and which will upon full inspection be
found to contain many earlier and well-stated cases, that this is

the proper meaning of the word "desertion" under our statute, and that when applied to Mrs. Rector's conduct beginning in October of 1907, it will be found that for more than two years after that time she willfully, continuedly and obstinately turned from and refused to perform her part of the matrimonial relation, and by doing so she deserted him within the meaning of the statute, and that the consequences are that he is entitled to a divorce upon that ground. I will so advise.

I have not been unmindful of the fact, although I have not before adverted to it, that under our law, where a wife has deserted the husband, before it can be found to be obstinate she must have been approached in good faith by him and requested to return and resume marital relations. I have no difficulty with the proofs in this case upon that point. Apart from the brief reference which I have already made to the ample testimony that the case contains of her declarations not only to her husband but to other absolutely impartial witnesses, that she was not then living with her husband and never would as a wife, would rather die than do so, and would not touch him with a ten-foot pole, there is ample evidence also of his *bona fide* efforts upon many occasions to have her return to him as a wife and resume their former marital life together. By their pleadings, at least, they each agree that a desertion took place in 1907; that at that time there was a breach of the marital contract, but each accuses the other of being the offender. I find, as previously stated, that the fact is that there was a complete breach of the marital relation dating from the period that they each fix, viz., October, 1907; that Mrs. Rector was the one who caused the breach and persisted in it; that it existed for the statutory period, and that during that time the husband, in good faith, sought upon several occasions to induce the wife to heal the breach and resume their matrimonial relations, not only sexual but complete and full relations; and that she, having made up her mind firmly to depart from and not return to matrimonial relations (comprehending as I have throughout in this term more than mere sexual relations), continued obstinately in that frame of mind and shaped her conduct accordingly.

The desertion having therefore been found, and that it was willfully pursued, obstinately persisted in against the will of the other party, and continued for the statutory period, the complete statutory offence has been made out.