ANNIE HORWATH, petitioner,

*v.*

ERNEST HORWATH, defendant.

[Decided April 26th, 1920.]

1. Where a husband provided his wife with merely food and shelter in his father's house and refused to perform any of his other marital duties, refusing sexual intercourse with her, holding no intercourse whatever with her and not providing her with clothing, he is guilty of willful and obstinate desertion.

2. After the continuance of such a desertion for a time sufficiently long to indicate its actuality, the wife is no more required to remain in that house than she would be in a separate abode from which the husband had fled.

3. The subsequent leaving of the house by the wife by no means presupposes an acquiescence by her in the desertion—especially where, by remaining, she was subjected to indignities by other members of the household.

On petition for divorce. On pleadings and proofs. On final hearing.

*Mr. Romulus P. Rimo,* for the petitioner.

*Mr. Henry M. Hartman,* for the defendant.

BUCHANAN, V. C.

The petition is filed by the wife for divorce *a vinculo* for the cause of desertion. The preliminary jurisdictional requisites being sufficiently established, the issue turns upon whether or not the circumstances disclosed by the evidence amount to a desertion of the statutory character, and whether or not those circumstances rest upon sufficient corroboration of the testimony of the wife.

The petitioner testified that defendant seduced her under promise of marriage, but refused to marry her, and only did so to avoid imprisonment after trial and conviction of the seduction, in the criminal court; that the marriage took place in the city hall on June 30th, 1915 (none of the husband's family attending except his father), and immediately after the ceremony she returned to the house of a Mrs. Noyes, where she was employed as a maid in domestic service, while her husband returned to the house of his parents; that they thus continued to live respectively until July 4th, 1915, when the time of her confinement was approaching and she left the Noyes house and went first to her brother's home and then, upon the advice of her sister-in-law, went to her husband at the home of his parents; that she stayed there with him for four or five weeks, leaving there on August 12th, 1915, to go back to her brother's, where her baby was finally born on September 23d, 1915.

After the birth of the child she returned to work and live at Mrs. Noyes', staying there until a week or two after the child died, August 29th, 1916, leaving of her own volition to enter the service and residence of a Mrs. Owen, with whom she stayed about seventeen months, and then returned to the service and residence of Mrs. Noyes, where she still remained at the time of the hearing.

Her husband never came to see her, or communicated with her, nor did any of his family, either prior or subsequent to her few weeks' stay at his father's house, nor did he or any of his family ever come to see the child or make any effort so to do—although he and his father attended the church services at the funeral of the child and paid the expenses of the funeral. Dur-

ing her stay at the Horwath house her husband occupied a room separate and apart from her, with his brother, petitioner being given and occupying a room alone, this arrangement necessitating that defendant's sister occupy the same room with her father and mother.

All of the foregoing is directly corroborated by other witnesses—chiefly defendant's witness—and is not disputed.

Now as to the cause of the separation. The defendant's father says that at the time of the marriage the husband was earning only $10 a week, and arrangements had been made by the father and son that the married couple should come and live at the home of the husband's parents; that after the ceremony he heard his son say to petitioner, "Now we got married, now come down and live with us," but doesn't remember her reply. It is easy to understand why the wife should have been disinclined to go to live at the home of the father who had aided his son in the endeavor to avoid the marriage he had promised, but we may assume that petitioner was not justified at that time in failing to go to live with her husband at his father's home. About a week after that she did go and take up her home there.

Her testimony as to the conditions of her life there and the reasons for her leaving is to the following effect: That none of the family would speak to her except the mother, who cursed her and called her a whore; that she worked about the house doing everything but the cooking; that the mother would not permit petitioner's husband to speak to petitioner; that her room had only a bed and trunk in it; that the mother was mean to her and never satisfied with the work done by petitioner; that she was afraid to eat for fear the mother would poison her, and finally she overheard the mother tell the father that when the birth of the child should occur she was not going to call a doctor or midwife or anyone, or even let any neighbors come in (this was on the day she left), and on her telling this to her husband he told her that if she didn't like to stay there she could go where she pleased, and he would do just as he pleased.

All of this, or practically all of it, was denied by the mother and father, and part of it by a neighbor, Mrs. Turay. The latter when pinned down admitted she had only seen petitioner two or three times in the four or five weeks, although her direct testimony was to the effect that she had seen her every day, and she was so obviously anxious to volunteer and testify to anything she thought would help the Horwaths that I regard most of her testimony as worthless. There are, however, one or two bits of it which impress me as having much significance. One of these relates to the petitioner's room. She says that Mrs. Horwath twice took her to this room "to show her what a nice room it was," once *before petitioner came there to live,* and the other time the day *after petitioner had left.* The other relates to the actual leaving by petitioner. She says that they (Mrs. Turay and the mother) were sitting in the kitchen and saw petitioner leave the house and go into a bakery store on the corner, that the mother at once said that Annie (the petitioner) had left, she didn't know why she left, that she (the mother) hadn't said a word. It appears that although Annie took some clothes with her, they were few and in a small bundle wrapped up in paper—so that the mother could by no means see what was in the bundle. Obviously, then, the only way in which she could have known that Annie was taking leave of the house must have been from something that had transpired earlier. Furthermore, that language of the mother —"I didn't say a word"—endeavoring to exculpate herself from blame for the daughter-in-law's leaving, indicated an existence and realization of guilt in the matter. The mother in her testimony in nowise denied or modified the Turay testimony.

As to the father and mother, portions of their testimony are quite obviously false. A mere preponderance of verbal testimony is of course by no means controlling. The testimony must needs be such as can be believed. *Daggers* v. *Van Dyck, 37 N. J. Eq. 130* (at *p. 132*) ; *Whelan* v. *Osgoodby, 62 N. J. Eq. 571* (at *p. 575*). It is impossible to believe that the mother "liked" the daughter-in-law and that they were "good friends," or that her room "was furnished better than the other rooms,"

when it is borne in mind that the parents, as they admit, not only did not advise their son to marry the girl whom he had wronged, but helped him to defend the trial and only told the son as long as he had been convicted, to marry her "to avoid trouble," *i. e.,* imprisonment. The father says: "I didn't want to be her father-in-law." Their hostility was apparent on the witness-stand, and its continuous existence is absolutely proven by their actions. What other explanation can there be for a mother-in-law making no effort to see or inquire for the girl whom the son had wronged (who was about to, and did later, give birth to her son's child), and who continued the same attitude after the child's birth and death? The explanation the mother gives—"because Annie left the house"—is ridiculous. She also gives as the reason for her not attending the marriage, and the child's funeral, that she was operated on and was too sick. But it later develops that the operation was only two years ago (the marriage, and child's birth and death being four and five years ago) and that her sick and weak condition was the same as at the time of the hearing in this case—which she found herself able to attend. There is also corroboration of part of the wife's story of the mother-in-law's character and actions in the testimony of a neighbor, Mrs. Gomany. But there is ample corroboration from all the surrounding circumstances—indeed from the actions and testimony of the husband's parents alone; and another circumstance of weight in a suit defended with such obvious hostility, is that neither the defendant himself, nor his brother or sister were called to testify (the son was only called at my suggestion and his testimony went no further than his earning capacity). See *Robinson* v. *Robinson, 83 N. J. Eq. 150* (at *p. 154*); *affirmed, 84 N. J. Eq. 201; Parmly* v. *Parmly, 106 Atl. Rep. 456* (at *p. 459*).

I am entirely convinced therefore that the father and mother were continuously and actively hostile to petitioner, that the son was influenced in the same behalf by his parents, that the petitioner's testimony of the treatment given her at the Horwath

home is true and sufficiently corroborated; and in my opinion that treatment culminating in the avowed purpose to deprive her of medical or other assistance at her confinement, was cruelty constituting sufficient justification for her leaving—and being acquiesced in by the husband constituted constructive desertion on his part. (The further comment may be added, that the story of the intent to keep doctor and midwife away is not at all the kind of story which would be apt to be manufactured by a girl like the petitioner under these circumstances. For a false story she would have chosen acts or threats of physical violence—and would furthermore have alleged the threats to have been made directly to her, with no other witness present, instead of to the father, since it was obvious that both father and mother would deny it.)

I have dealt with the case thus far as one of constructive desertion, because it was upon that theory that the case was tried by counsel on both sides and their respective briefs submitted. It is, however, I think, obvious from all of the circumstances in the case, that resort need not be had to the doctrine of constructive desertion—that that which occurred was in fact actual desertion by the husband.

When the wife came to her husband at the Horwath home, she was provided with food and shelter—nothing more. The husband failed and refused to perform any other of his marital duties. Not only was there no sexual intercourse, but no intercourse whatever. He did not even provide her with clothing—the excuse being that she had caused so great an expense in the defence of the seduction proceedings that he could not afford it. It is clear that the husband intended to do nothing more than he was compelled to do—first, in the actual marriage, and second, in his relationship with her after marriage. He supported her, that is, he provided her with food and shelter, only because he was legally obliged to do so, and he did so in the least expensive way possible, namely, at his parents' home; refusing his wife's requests to provide a home and be a husband.

This conduct of his clearly constituted a willful and obstinate desertion. *Rector* v. *Rector, 79 Atl. Rep. 295; Raymond* v. *Raymond, 79 Atl. Rep. 430.*

It need not be added that the desertion is none the less the husband's act, because he may have been influenced thereto by his father and mother; nor need I point again to the corroboration supplied by the entire evidence in the case. It would indeed be the natural and probable thing to expect that the husband's conduct, after such a marriage as this, with all its accompanying circumstances, would be just what transpired.

The only variation in the present case from such a desertion as occurred in the Raymond and Rector cases is that the wife did not remain in the same house with the husband throughout the entire period of desertion, but left after some four weeks. I cannot see that this is of the slightest materiality. If the married pair had had a separate home and the husband had deserted the wife by leaving that house, no one would contend that the wife must remain in the house until the desertion period should be complete, or that her act in leaving it after the desertion commenced would be any evidence of an acquiescence on her part in the separation.

The case *sub judice* presents no essential variation from this. The husband withdrew from and deserted the wife, although continuing to live under the same roof. To say that her subsequent departure from that house (even without the immediate actuating cause which occurred on the day of her leaving) evinces a consent to the separation, would in my opinion be an averment of a conclusion without the slightest foundation therefor. To require her to stay in the same house and suffer the indignities offered her by the inmates thereof would be to require her to submit to insult as well as injury. That she found it too high a price to pay for her food and shelter is entirely natural.

The desertion was the husband's act—not hers. Having commenced it, the duty was upon him, not her, to terminate it. She was under no duty to make advances to him, nor to stay in

the house simply in order to be close at hand in case his frame of mind should change. The desertion having thus commenced, it would continue until the husband terminated it, or made some sufficient attempt so to do. This he never did; notwithstanding the birth of the child and the wife's message to him at the time (corroborative of the fact that the separation was against her desire) he never made the slightest attempt to see or communicate with her. His conduct and that of his family, throughout, even down to and including the hearing of the cause, showed beyond the slightest doubt that neither he or they had any feeling but hostility toward her, and a desire to avoid the payment of alimony.

Upon the question of his earnings, the only testimony was that of the husband himself—to the effect that he was working for the J. L. Mott Company on some kind of machine work, for nine and three-quarters hours per day at forty-two cents an hour, and his average wages amounted to $22.50 per week; that he lived with his parents and paid them $12 a week board. He has had seven years' experience at his trade, and from his appearance and the well known conditions as to labor and wages obtaining at present, and for some time past, I am quite sure that he could earn more if he chose. The smallness of his wage and the large proportion paid to his mother for board indicate an attempt to minimize such alimony as he might be required to pay, if his wife were successful in her suit. I am satisfied that he can and should pay to petitioner the sum of $10 per week.

A decree will be advised in accordance with the foregoing.