ELIZABETH P. PARMLY, petitioner,

*v.*

J. FRANK PARMLY.

[Decided March 17th, 1919.]

1. Unjustified refusal of sexual intercourse persisted in willfully, obstinately and continuously for the period of two years is a ground for divorce for the cause of desertion; the opinion expressed by the chancellor to the contrary in *Watson* v. *Watson, 52 N. J. Eq. 349,* is overruled by *Raymond* v. *Raymond, 79 Atl. Rep. 430.*

2. Corroboration need not necessarily be by the testimony of other witnesses to the facts. The circumstances surrounding the acts of the parties, rendering petitioner's testimony more probable, the circumstances surrounding the case, including the manner in which the trial, if contested, is conducted, may all be considered in corroboration of petitioner's story.

3. While a divorce cannot be granted upon the uncorroborated testimony of petitioner and defendant, there may be considered as corroboration the circumstances surrounding the case, including, among other things, the manner in which the trial is conducted. *Foote* v. *Foote. 71 N. J. Eq. 280; Robinson* v. *Robinson, 90 Atl. Rep. 311; affirmed, 93 Atl. Rep. 699; Rogers* v. *Rogers, 89 N. J. Eq. 1; Orens* v. *Orens, 88 N. J. Eq. 29,* followed.

On bill, &c.

*Mr. Frederic W. Smith,* for the petitioner.

*Mr. Otto A. Stiefel,* for the defendant.

LANE, V. C. (orally).

The suit is for divorce on the ground of desertion. The charge is that the act of desertion consists in the refusal of the husband to have sexual intercourse with the wife.

The parties were married August 2d, 1911. The husband is now forty-one; the wife thirty-eight. Immediately upon their marriage they went to live in a house which had been built by

the husband in anticipation of the marriage, a bungalow in South Orange, and have continued to live there ever since. The year after the marriage a sister of petitioner, who is now I think fifteen years old, came to live with them. In the summer of 1915 a brother of petitioner came to live with them; I should imagine at that time he was about twenty-three or twenty-four years old. He continued to live in the household for a period of twenty months. The sister had no other place to go, and an arrangement was made that the father should pay board for her. He paid board at the rate of about $5 a week, up to the time of his death, and after his death various other members of the wife's family contributed sufficient to continue the payments. The brother, during the time he remained at the house, paid board, beginning at $7 a week and afterwards increased to $12 a week. There was no objection whatever on the part of defendant to the entry into the household of the sister and the brother, and none of the difficulties which came into the life of the parties is attributed by either to the presence in the household of these members. The husband did not object; on the contrary, he treated the sister and the brother both as members of the family. Petitioner became pregnant about a year after her marriage. She says that her husband suggested that she have an abortion performed and that he made the arrangements for it. He, on the contrary, says that she made the suggestion and that he acquiesced. Two years after the marriage she again became pregnant and another abortion was performed. She says that, as before, he was the person suggesting it and he states that it was she who suggested it. I find the fact to be that the abortion was not disagreeable to either of them, that neither of them at that time desired an increase in the family. His acquiescence, if such it was, was not due to any desire to save his wife trouble or any desire to comply with her wish; it was due to his own desire not to have any children. I believe the testimony to the effect that he did not care for children in such a way as that he desired to have them of his own. There is no evidence before me from which I can find that she would not have acquiesced in any wish expressed by him and had a child. He did not do that which a husband, I think, under the circum-

stances, is always called upon to do, not only refrain from urging an abortion, but give the wife the benefit of his assurance at least that he will be perfectly satisfied if there are children.

After the second abortion precautions were taken in respect to sexual intercourse which continued down to June, 1915, as both parties agreed. These precautions were taken with the acquiescence of both. The wife did not during the interim become pregnant. I am satisfied, beyond question, from the testimony of petitioner and defendant, that in June, 1915, defendant made up his mind that thereafter he would have no sexual relations with his wife. He testified on the stand, under my examination, that he definitely made up his mind at that time that he had not changed his mind, and, yesterday, when examined, said that there was not anything that could make him change his mind. To-day, recalled by his counsel, he intimates that if his wife will treat him properly, then he may change his mind, but he does not now go to the extent of saying that he will resume matrimonial intercourse. He makes, and has made, no offer.

He justifies taking the position that he did in June, 1915, by the statement that about that time the wife had, during the course of conversation, accused him, as he puts it, of having been the cause of the abortion, and he thereupon made up his mind that there would never again be cause for an abortion so far as he was concerned. He can remember none of the details of the conversation, or what the talk was about; he does not remember the words which were used by which the wife made the accusation; simply there sticks in his memory the fact that the accusation was made. Upon being pressed, he says that the talk was about some unkind things which she had said to him, but he does not remember what the unkind things were. He denies that the reason why she said she accused him of being the cause of the abortion was that he could not make money enough to support the family. The wife tells a consistent story of this conversation. She denies that she accused him of being the cause of the abortion. She says that she did say to him that she had had her last abortion. I believe the story of the wife. The statement that she had had her last abortion may have seemed

*90 N. J. Eq.*                    Parmly *v.* Parmly.

to him to be an accusation that he was the cause of the abortion. The proofs show that it was after she had made this statement that he made up his mind that he would have no further sexual relations with her.

Now, of course, it is impossible for me to determine what really induced the man at the time to decline to continue sexual relations, whether to protect himself from being charged with being the cause of an abortion, or whether, because she had stated that she had had her last abortion, he did not want thereafter to have sexual relations, because of fear that there might be off-spring. I am unable to determine that question, and I do not think, in the view that I take of the case, that it is necessary that the real actuating cause be determined, because in either event I do not think that the husband was justified, by the remark made by the wife, in taking the position that thereafter, never again, under any circumstances, would he resume matrimonial intercourse. The charge was not one which was repeated; it was not one which had been made before. If made at all, it was made in the heat of a controversy in which he probably said as much about her as she said about him.

On the stand he testified that up until that time, June, 1915, there had been no serious difficulties between the parties. He said that she had said some unkind things about him, or performed some unkind acts. The only example of such unkind acts which he could remember was that one night—one Saturday afternoon I think it was—when he came home with a headache, he found her brother and a young girl, to whom he was engaged, at the house, and that he had upbraided his wife then for having them there without having notified him; he considered that that was an unkind thing. If all the unkind things which the wife did to him were in line with that, it hardly need be said that it did not constitute sufficient justification for cessation of matrimonial intercourse. The story with respect to the wife slapping at the husband with a silver knife I discount. There were no acts on the part of the wife prior to June, 1915, which justified the husband in taking the attitude which he then took. Although the social intercourse of the parties had not been

great, they had not gone out to any great extent, yet they did upon occasions go out.

As to the financial relations existing between the parties: At the time of the marriage the wife was given $23 a week to run the house and buy her clothes, and, subsequently, this was reduced to $20 a week, and for a period of seven weeks, in 1918, it was cut off entirely. The husband had been unfortunate financially. He had, and has, a desire to pay his debts, for which he is to be commended. I think, however, that possibly considerable of his trouble is due to the fact that he has put entirely too much stress on the payment of his debts and too little on the happiness of his family. He was unfortunate. There was no fault attributable to him because of his failure, and if his wife did make the statement, that he says she did, that he ought to go through bankruptcy, she was merely asking him to take advantage of a law designed for the protection of such as he, those who have gotten into financial difficulties through no fault of their own. It was not an unnatural thing for her to do; it would not have been an unnatural or an improper thing for him to have done. He is not to be blamed for his desire to pay his debts, but the result has been that the wife has not had, during their married life, any too much money. The charge was made against the wife that she compelled him to leave the house for a period of seven weeks, I think it was, during the time when he paid her nothing. She did, when she received no money from him, tell him that he had better eat at his mother's, and he acquiesced and went to his mother's. When he did get money he came back and then left $20 on the bureau to pay the next week's board and said he intended to eat at his own home thereafter. I find nothing in the financial relations of the parties which justified the husband in taking the attitude that he did.

After June, 1915, a change came with respect to the manner in which the husband treated the wife, and she him, in other than purely sexual ways. He withdrew himself from her society as much as he could; he did not take her out at all; he repelled every effort she made at display of affection. Conditions gradu-

ally became worse until, finally, in August, 1917, upon her return from the country, he ceased talking to her at all, and has continued, although living in the same house and eating at the same table, to refrain from talking to her. The parties slept in the same bed until January, 1918, when the wife, because of the increasing disagreeable attitude of the husband toward her, was forced to leave the room of her husband. The wife has made efforts to induce the husband to resume the relationship of husband and wife. He concedes this. She has made efforts when they were in bed in the bedroom. Upon each occasion he has repelled her. She has endeavored to display affection toward him in the presence of others. The latter acts are corroborated. She has endeavored to sit on his lap and he has on each occasion rebuffed her and said that he hated to touch her and that he wanted to have nothing further to do with her physically.

I am unable to find that the act of the husband, continually persisted in for the past three years, in ceasing sexual intercourse, was justified.

Under the law as it now is settled in this state, refusal of matrimonial intercourse, unjustified, is a ground for divorce for the cause of desertion, although it would seem to me that, in this case, it may not be necessary to go to that length, because we have here, as we had in *Rector* v. *Rector, 78 N. J. Eq. 386,* a cessation of matrimonial relations other than the purely sexual, as, indeed, one might say we will almost necessarily find commitant with a cessation of the sexual relations in any case. The husband and the wife performed toward each other no other duties than those which Vice-Chancellor Garrison said in the *Rector Case* might well be performed by a housekeeper or a boarder; they did not go out; there was no social intercourse, instead of being submerged in one household, as it were, or a part of one household, there were two absolutely independent human beings getting along or proceeding without the close intimacy which naturally exists between a husband and wife. It may not be necessary to go to the extent of holding for the purpose of this case that cessation of matrimonial intercourse is a ground for divorce for the cause of desertion, but it seems to me

to be clear that the case of *Raymond* v. *Raymond, 79 Atl. Rep. 430,* cited in *Rector* v. *Rector,* must be considered as authority for the latter proposition. It is attempted to distinguish the *Raymond Case* upon the ground that, in that case, there had been no sexual intercourse whatever, so that the marriage had not been consummated. I cannot see the distinction. The *Raymond Case* might well have been brought by bill in equity to set aside the marriage on the ground of fraud—that is, the intent not to consummate the marriage might have been conclusively presumed to have been present in the mind at the time the marriage was contracted as the intent not to marry is presumed in an action for breach of promise, where there is seduction. *Perry* v. *Orr, 35 N. J. Law 295,* so, that there could be said to have been fraud in the inception of the contract. But that course was not pursued. Suit was brought for divorce for desertion. It was held that the refusal to have matrimonial intercourse for a period of two years, willful, continued and obstinate, without justification, was a cause for divorce. There can be no logical distinction drawn between that case and this case, based upon the proposition that in that case there had been no sexual relations at all and in this case there have been. The *Rector Case* does not go to the extent of holding that mere cessation of sexual relations is sufficient, but the *Rector Case* does hold that the cessation of matrimonial intercourse is a most important feature. Mr. Justice Van Syckel, in the *Raymond Case* (and his opinion, so far as this issue is concerned, must be considered that of the court, for upon it the decree was signed), approves the language of Bishop, which is to the effect that cessation of matrimonial intercourse is sufficient, is desertion and is opposed to the Massachusetts rule, which seems to have been the rule approved by Chancellor McGill in *Watson* v. *Watson, 52 N. J. Eq. 349.* While *Watson* v. *Watson,* as Mr. Justice Van Syckel pointed out in the *Raymond Case* may be distinguished, because in that case the husband had made no effort to induce his wife to have sexual relations with him, the statement of Chancellor McGill that cessation of sexual relations is not a cause of divorce, I think must be held to have been definitely overruled

by *Raymond* v. *Raymond*. Under the law, as I find it now laid
down, I think the right of a married couple to sexual inter-
course is a right the total unjustified deprivation of which by
one party or the other warrants a decree of divorce on the ground
of desertion.

The question then arises whether the acts have been suffi-
ciently corroborated, whether the fact of the cessation of sexual
intercourse has been sufficiently corroborated to justify a decree.
There is no doubt in my mind whatever as to the facts in this
case. There is no conceivable question but that what the hus-
band and the wife testified to did, in fact, occur. Notwithstand-
ing the fact that they slept in the same bed, the case is free from
any suspicion or possibility of collusion. The question is
whether the rule which has been held to be the law in this state
that a divorce will not be granted upon the uncorroborated tes-
timony of the petitioner and the defendant, operates to prevent
a decree in a case such as this. It was said in *Rogers* v. *Rogers,
supra; Foote* v. *Foote, supra; Orens* v. *Orens, supra; Robin-
son* v. *Robinson, supra; affirmed, supra,* that the corroboration
necessary need not be corroboration by witnesses, but there may
be corroboration from circumstances—corroboration from what
may be termed the atmosphere of the case. I find in this case
that there has been such corroboration. It is true that there is
not testimony (corroborated) before me that from June, 1915,
until a period in 1917 there was such a marked difference be-
tween the conduct of the parties then, and the conduct of the
parties preceding June, 1915, as to indicate standing alone a
cessation of matrimonial intercourse. There is evidence, how-
ever, from the witness Gladys, and I think from others from
June, 1917, down to the present time that the relationship of
the parties had become so strained that, as in the *Rector Case,*
there was nothing left of the matrimonial status except support
given by the husband to the wife. Such a condition, of course,
is one which probably would exist in a case of cessation of matri-
monial intercourse. There are the letters which were written in
September and November, 1917, to the husband in which the
wife indicates clearly her desire to return to a life of husband

and wife, and indicates clearly that the non-relationship had been existing from a period in 1915 or thereabouts. He did not reply to the letters.

We have also the statement which he made in the hearing of Gladys and of the laundry woman, admitting that there had not been sexual relations for a period of over two years.

There is another atmosphere which I think may be considered, or rather there is another element which may be considered in arriving at what is the atmosphere of the case which may be considered corroboration, and that is the atmosphere of the trial. The trial has been conducted in this case in such a way, and the parties have so testified and acted towards each other in the presence of the court, as have their counsel, that any idea of collusion is impossible to conceive. Taking everything into consideration, the circumstances surrounding the parties which have been testified to by witnesses, and the atmosphere of the trial, I think there is sufficient corroboration here of the fact of cessation of matrimonial intercourse from June, 1915, down to the present time and that the conduct of defendant was willful and obstinate. This woman, as I have before stated, endeavored to get her husband to resume matrimonial intercourse both by letter and by offers. She has gone as far, certainly, as I would hold any woman is obliged to go under the circumstances; and I am not now laying it down as a rule that a woman is obliged to go to any such length as she has gone.

I will advise a decree *nisi.*