ALEXANDRA LAVOIE BLAIN, petitioner-appellant,

*v.*

MARCEL G. BLAIN, defendant-respondent.

[Submitted October 16th, 1945.   Decided February 13th, 1946.]

*Messrs. Levenson & Levenson (Mr. Abe D. Levenson,* of counsel), for the appellant.

*Mr. Albert J. Shea,* for the respondent.

The opinion of the court was delivered by

RAFFERTY, J.

This appeal is from a decree of the Court of Chancery dismissing petition for divorce sued out by the wife and granting judgment to the defendant husband on his counter-claim against the wife for moneys of the husband wrongfully converted by the wife to her use in the sum of $600.

The petition for divorce was grounded in extreme cruelty and the facts alleged in support thereof recite a course of abnormal sexual demands made upon the wife by the husband and of sexual perversions practiced upon her, all of which, it is said, made the wife fear for her health and caused her apprehension respecting her mentality and the safety of her person. The husband answered denying the charges thus laid against him and counter-claimed for certain moneys and securities which, he alleged, the wife had wrongfully converted to her own use. The answer to the counter-claim put the entire matter at issue.

The testimony of the wife adduced at the hearing of the matter followed the allegations of the petition. The acts complained of, except in the single instance of an act said to be performed in the presence of the wife's sister, were done in the privacy of their bedroom. Corroboration of the testimony of the wife, in the nature of the case, was sought to be established under the rule expressed in *Grobart* v. *Grobart, 107 N. J. Eq. 446, 449; affirmed, 109 N. J. Eq. 129.* To this end a physician who had treated petitioner and a sister of petitioner testified in her behalf.

The testimony of the physician fell far short of corroboration. He testified on direct examination that when he first saw petitioner in 1939 "She was in a very nervous and high-strung state." When the witness saw petitioner in January,

1944, "She was highstrung and very nervous and it took a sedative to bring her under control." A hypothetical question being then propounded, in which was included the items of sexual perversion testified to by the wife, the physician was asked, "* * * would you say that her condition that you observed and found her in in January, 1944, could be attributed to that kind of conduct? A. Probably."

On cross-examination the doctor testified as follows:

"Q. She never told you that she had been abused sexually, did she, when she came to you for treatment? A. Oh, the statement she made here.

"Q. I mean to you, doctor. A. Me? Those statements she made here, she made nearly all of those to me."

He testified also:

"Q. Did you see her any time prior to July, 1943? You saw her, didn't you, doctor? A. Well, I don't recall. She had been in from time to time but not regularly for any treatment.

"Q. Would she be nervous all the times you saw her, prior to July, 1943? A. Would she be nervous? Well, if I hadn't seen her I couldn't say. * * *

"Q. So, then from January, 1939, up to this date to-day, she hasn't consulted you regarding any sexual abuse, has she? A. No. * * *

"Q. I mean did you examine her organs—did she complain to you that she was being sexually abused in her marriage life from January, 1939, to the present time? A. No, we never discussed that."

Petitioner's sister testified as follows:

"Q. And did you see some trouble between her [petitioner] and her husband? A. Yes.

"Q. Slowly, tell the judge what you saw and heard. A. * * * I came up to help her, and she was getting supper ready, and her husband came in and put his hand under her dress and wouldn't let go. She pushed him and started to cry, and then she pushed him again, and she was crying and she told him, 'you ought to be ashamed in front of my sister.'"

This witness testified also that petitioner had been in good health prior to her marriage, that during the nine and one-

half years of married life petitioner had become nervous, which condition became progressively worse during the time the parties lived together, but that since the time petitioner left her husband and lived apart from him her nervousness had disappeared and she had become quite normal.

On the defendant's case the husband admitted a strong sexual appetite but explicitly denied the charges of perversion alleged against him. He explained the incident testified to by petitioner's sister as follows:

"*Q.* She [petitioner's sister] took the stand here and testified as to what happened·in July, 1943. Now, just what did happen on that day when she was present? *A.* Yes. Well I came home, and tried to kiss my wife like usual, and she never wanted, she never was warm toward me, she never wanted to kiss me. I mess up her make-up if I kiss her, and if I went——If I tried to squeeze her, she had to watch out for her shape.

"*Q.* Is that what she would tell you? *A.* That's right."

In commenting upon this feature the learned Advisory Master said:

"Looking at this in the light most favorable to petitioner, it indicates roughness and coarseness on the part of the defendant which was embarrassing to her [petitioner] because of the presence of her sister. It does not tend to support· petitioner's charges of perversion and sexual abuse."

In his conclusions the learned Advisory Master characterized the testimony of the physician "as being vague and of little weight." He said also:

"No useful purpose would be served by reciting petitioner's testimony, but careful consideration of it leads me to the conclusion that some of it, if not inherently improbable, is very close to being so. They admit that they slept apart during the six months immediately preceding the separation and it is significant that it was he who left their bed and went to a couch. He said he did this because she complained of his restlessness. Her explanation of his withdrawal from the marital bed is not credible. If the facts were as she would have us believe, it is to be doubted that he would withdraw and retire to the couch for a six-month period.

"During the last several years they lived together, defendant was a shipyard worker, steadily employed every day and overtime. It is difficult to understand how he could keep her awake most of the night (she testified she slept 'only a couple of hours at night') and still be able to work daily at what apparently was a laborious job. * * *

"As to matters which the ordinary woman finds it difficult and embarrassing to discuss in the court room, petitioner testified without any difficulty. There was no hesitancy, no reticence, no restraint. Indeed she was eager and voluble. Her testimony lacked conviction.

"There was an element of frankness about defendant's manner and testimony that would lead one to believe him."

In all of this we concur.

Appellant urges, upon the authority of *Rains* v. *Rains, 127 N. J. Eq. 328,* that the express testimony of the wife cannot be rejected on the sole ground of its improbability. In that case this court said:

"However, where the testimony would be sufficient to establish grounds for divorce, and that testimony is unimpeached, uncontested, and not inherently improbable, we do not think that a mere general observation of demeanor, unsupported by examples of action or attitude which would inspire disbelief, is sufficient to support a finding that the testimony was untrue."

This mere statement evidences the inapplicability of the case as authority in the present action. A careful review of all of the evidence leads us to the conclusion that the learned Advisory Master correctly advised the order dismissing the wife's petition. *Cartan* v. *Phelps, 91 N. J. Eq. 312.*

As to the counter-claim of the husband, it was shown that he had made substantial savings which were deposited in a bank, and additionally, he had purchased war bonds in the sum of $1,150. The court below concluded that all of the money that went into the bank accounts and for the purchase of bonds came from the defendant's earnings, that the bonds originally purchased and those purchased with withdrawals from the bank accounts were settled upon petitioner for the benefit of the two children of the marriage, but that petitioner

failed to prove a gift or settlement of the sum of $600 which she withdrew from the bank without defendant's knowledge or consent shortly before she left him.

Respecting this last mentioned item, the wife testified:

"*Q.* * * * What did you do with that $600? *A.* Before I left him, I asked him if he was going to give me money. He said no, he would go to jail before he gives me a penny, and then I drew the money out and then I looked for rooms. How much money did I pay out—I have it—$300 I paid my daughter's hospital bill, I paid the moving, I paid my daughter's bills—she had to have her eyes examined—and that left $200. I had to borrow money from my mother. I didn't get my money for six months. I couldn't pay rent and live on $200."

She testified also:

"*Q.* Did you tell your husband you were taking the $600? *A.* Yes, I did tell him.

"*Q.* Out of that $600, you gave Mr. Levenson $350? *A.* That's right, sir.

"*Q.* To bring the separate maintenance suit? *A.* That's right."

These recitals of expenditure of the $600 emphasize the unreliability of the wife's testimony throughout. It is clear vindication of the conclusion that her testimony respecting the alleged abnormal practices of the husband was gross exaggeration if not downright falsehood.

Assuming, however, that the disbursements were made and for items which may be classified as necessaries for which the husband is ordinarily liable but which he neglected or refused to provide, or were charges imposed upon the wife growing out of the husband's fault, nevertheless, the wife does not thereby gain the right to self-help to her husband's accounts without or against his consent. A wealth of legal remedy is provided against the husband who is delinquent in reasonably meeting his obligations to his family. If there be any circumstance in the law as to justify such a taking of the husband's property it is not discernible in the factual situation here presented.

There is no proof whatsoever of gift or settlement by the

husband. *Farrow* v. *Farrow, 72 N. J. Eq. 421, 423; Schuler* v. *Schuler, 114 N. J. Eq. 220, 225.* The trial court properly determined the matter.

The decree appealed from is affirmed.

PERSKIE, J. (Dissenting.)

The great weight which we give to a finding of fact by an Advisory Master clearly imposes no restraint upon this court to ascertain, by investigation and analysis as to what the facts are, and whether the general finding is consistent therewith. *Naame* v. *Doughty, 109 N. J. Eq. 525, 535; 158 Atl. Rep. 501; Real Estate-Land Tille, &c., Co.* v. *Stout, 117 N. J. Eq. 37, 41; 175 Atl. Rep. 128; Howes* v. *Howes, 125 N. J. Eq. 272, 277; 4 Atl. Rep. (2d) 282.*

In ascertaining the facts, in cases of this type, the "corroboration" of them need not necessarily be by "witnesses." For there may be corroboration from the "circumstances" of the case, "corroboration from what may be termed the atmosphere of the case." *Parmly* v. *Parmly, 90 N. J. Eq. 490, 497; 106 Atl. Rep. 456.* In my humble judgment the very facts upon which the majority denied the wife relief are sufficiently corroborated both by the circumstances and the atmosphere of the case. At the very time the wife was bearing their twin daughters the husband became infected with a venereal disease. While the wife condoned same by cohabitation, the husband thereafter continued his abnormal sexual demands and practices which are too filthy to detail. Little wonder that she left him.

It is interesting to note that prior to the instant suit, based upon extreme cruelty, the wife filed a suit against her husband for separate maintenance and support. That suit was grounded upon the identical facts and circumstances detailed in the instant suit. The husband did not contest the charges made and a decree was accordingly entered against him on June 16th, 1944. Why did the husband contest the instant suit? He did so primarily to wrest the money in their savings account from the wife. What use did the wife make of the $600 which it is claimed she withdrew without her husband's knowledge or consent, but which lack of knowledge or

consent she denied? She used part of that sum to defray the costs of medical and hospital charges incident to the operation on one of their daughters for an appendectomy. For the money so used, the husband would clearly be responsible irrespective of whether she was or was not justified in leaving him. She further used part of that money to make up her husband's defaults in providing for her maintenance and that of their children. Here, again, the husband would by like token be obliged to provide for the maintenance of the children. She further used part of that money to defray counsel fees, and costs for moving. As to these costs and those relating to her maintenance, the husband would also be liable if her leaving him was, as I think it was, justified.

Therefore, I vote to reverse the denial of the wife's petition for divorce and the direction that she return the sum of $600 to her husband.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, CASE, HEHER, COLIE, OLIPHANT, WELLS, RAFFERTY, DILL, FREUND, MCGEEHAN, JJ. 11.

*For reversal*—BODINE, PERSKIE, JJ. 2.

*For modification*—DONGES, J. 1.