# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF PLYMOUTH, OCTOBER TERM 1867, AT PLYMOUTH.

PRESENT:

Hon. GEORGE T. BIGELOW, Chief Justice.
Hon. EBENEZER R. HOAR,   ⎫
Hon. REUBEN A. CHAPMAN,  ⎬ Justices.
Hon. DWIGHT FOSTER,      ⎭

---

### Lucy M. Bailey vs. Elbridge Bailey.

To support a libel for divorce for cruel and abusive treatment, or cruelty in neglecting or refusing to provide suitable maintenance for the wife, it must appear that the cruelty was such as to cause injury to the life, limb or health of the libellant, or a danger of such injury, or a reasonable apprehension of such danger if the parties should continue to live together.

When, on a trial, several witnesses have rendered contradictory testimony, no exception lies to the refusal of the presiding judge to instruct the jury what their verdict should be, if they should believe the testimony of one particular witness to be true.

LIBEL for divorce from bed and board, alleging that the parties were married on December 19, 1852, and lived together as husband and wife until December 14, 1866; and specifying for causes of divorce, that the respondent " grossly, wantonly and cruelly neglected and refused to provide suitable maintenance for her, the said Lucy, he being of sufficient ability so to do," and also that he " treated the libellant with extreme cruelty,

and bruised and beat the person of the libellant in such a manner as to endanger her life, and threatened to take her life;" and praying for the custody of their two minor children.

The case was tried before *Gray*, J., with a jury, and came before the full court on a report by him substantially as follows:

The libellant testified that early in July 1866 she was in her bed-ocm, with her mother and another lady, and was dressing to go out, when the respondent entered, and after some conversation seized her as she was leaving the room, and shut her arm in the door, and kept it there for some minutes, at the same time biting it, and did not desist until a neighbor, attracted by her cries, came in and remonstrated; that the respondent replied that he was not hurting her; that her arm was thus made purple from her wrist to her shoulder, and did not get well for three or four weeks, and bore the imprint of the respondent's teeth for a fortnight; that on July 27 the respondent forsook her without cause, took away the greater part of the furniture, and left no provisions, except a little flour and a few potatoes, for her and their two children, a boy six years old and a girl eleven years old; and that, on the following day, having no sufficient bed or food, or means of obtaining either, she went with her children to her mother's house in the same town and there remained, receiving no support or offer of support from the respondent, until August 22, when, at his solicitation, she went, with their children, to live with him in an adjoining town; that on November 24 he struck her on the side of the face, and the blow made her stagger and fall against the stove, and raised a bunch as large as a hen's egg, which continued of that size for a fortnight, and did not disappear for three weeks; that she never struck him, nor laid hands on him, nor pulled his beard; that on the night of December 13 he threatened to take her life; that on December 14 she left him and went to her mother's house, because there were no provisions in their own house but bread and cold water, and had been nothing else there for a week, and the respondent, three times during the week, when asked to provide for the family, had refused to do so, and said he never would do

so while she lived there ; but that another reason for her leaving was that their son had been badly hurt by falling on the ice and had been taken to her mother's house; that during part of the preceding autumn the respondent provided well for his family, but part of the time did not; that from December 14 to December 21 she went daily to their house, but found no provisions there; and that on December 21 she asked the respondent for her furniture, and took it away from their house, to which she never afterwards returned; that he made no objection to her leaving; that she did not then ask him to provide for her, nor did he offer to do so, nor had he since offered to provide for her or their children, but that she had supported herself and them, with some assistance from her mother.

The libellant's mother was a witness and corroborated her statements in regard to the alleged assault in November, and the appearance of her arm after the alleged assault in July, and testified also that during the autumn of 1866 there were two or three occasions when the family had no provisions except bread and water, for a week; and that the respondent provided fairly for his family until the last three months of their living together. It was in doubt and controversy upon the whole evidence how much, if any, of the quarrel in November this witness saw.

The libellant's daughter also testified in substance as the libellant, concerning the lack of provisions; and a constable, who assisted in removing the libellant's furniture on December 21, testified that at her request and in presence of the respondent he then searched the house for provisions, but found nothing but a little molasses; and one Marianne Hackett testified that about December 12 the respondent applied to her for board for himself, and said that he would neither provide for his family nor make his wife's home pleasant so long as she stayed at his house.

With regard to the alleged assaults in July and November, one witness testified that after the former he saw prints of teeth on the libellant's arm, and another witness testified that after the latter the respondent admitted to him that he struck the libellant.

The physician who attended the son after his fall on the ice

in December testified that the boy was well enough to have gone home again the next day.

It was admitted that the respondent had constant employment and earned from nine to nineteen dollars per week, and that the parties had not cohabited together since the alleged assault in November.

The respondent was a witness in his own behalf, and testified that on the day of the alleged assault in July the libellant said that she was going away, and, on his asking " Where ? " replied, " None of your business ; " that he started to shut the door, and she put her arm between it and the jamb and seized his beard and pulled some of it out ; that in November she tried to throw a dishful of hot water in his face, and he, in trying to strike the dish out of her hand, missed it, and unintentionally hit her on the face ; that he never struck or assaulted her otherwise, or on any other occasion ; and never bit her ; that during all the time in question he spent all his earnings for the support of his family, and that from August 22 until their final separation ·in December he provided suitably for her ; but he did not deny that he removed the furniture on July 27 and neglected to make provision for her from then till August 22.

A witness called by the respondent testified that at the time of the alleged assault in July the respondent had hold of the door and of the libellant's arm, apparently trying to move her arm so that he could shut the door, and that she had hold of his beard and dropped a small handful of hairs on the floor ; and that afterwards on the same day the libellant showed the witness her arm and he saw no marks of teeth upon it, and the libellant said nothing about its having been bitten.

There was other testimony tending to show that the libellant's bruises were less than she testified to, and that about two months before the separation she said to different persons " that she would like to get rid of her husband if it did not cost too much money ; she wished he would do something that she might get a clue to him and have him arrested and out of the way, and she wished the Lord would remove him, but how she did not care ; " and that after the alleged assault in November

she said " that she and her husband had had a severe quarrel, and got to calling names, and she threw a basin of water on him, and he struck her and she struck him back."

The questions " whether there had been such cruel and abusive treatment of the wife, or such gross or wanton and cruel neglect to provide for her, as to warrant a divorce," were submitted by the judge to the jury with instructions (among others not excepted to) " that no acts or treatment or conduct would be cruel, within the meaning of the statute, which did not cause an injury either to her life, limb or health, or create a danger of an injury to her life, limb or health, or at least create a reasonable apprehension in the libellant of danger of injury to her life, limb or health upon a continuance of their living together."

The libellant requested the judge to instruct the jury as follows :

" 1. If they should believe that the respondent left his wife about July 27, and furnished no support to her, and left her no furniture or provisions, as she testified, until August 22, it is sufficient neglect, within the statute, to warrant a verdict for the libellant. 2. If they should believe that there was no provision for the wife in November and December except substantially as testified to by the libellant, it would warrant a verdict for the libellant. 3. If they should believe that the acts of alleged cruelty in July, or in November and December, were substantially as claimed by the libellant, such acts, or either of them, are sufficient, if not condoned, to warrant a verdict for the libellant." But the judge declined to give these instructions.

The jury found for the respondent ; and the libellant alleged exceptions.

*J. B. Harris,* for the libellant.

*B. W. Harris & P. E. Tucker,* for the respondent.

CHAPMAN, J.    By St. 1785, *c.* 69, § 3, extreme cruelty was the only cause for which a divorce from bed and board could be granted.    In *Hill* v. *Hill,* 2 Mass. 150, the court held that abusive and threatening language did not amount to extreme cruelty.    In *Warren* v. *Warren,* 3 Mass. 321, Parsons, C. J., said extreme cruelty meant personal violence, and an-

swered to the *sævitia* of the civil law. And in that case it was held that desertion by the husband for a period of eight years, in consequence of which the wife and children had suffered many great privations, and become much distressed, was not extreme cruelty. In *French* v. *French*, 4 Mass. 587, it was held that a single instance of personal violence, without provocation, did constitute extreme cruelty.

The restricted definition which the court had then given to the term "extreme cruelty," left the law in an unsatisfactory condition; and by St. 1810, c. 119, two new causes of divorce from bed and board were added, namely : utter desertion; and grossly, or wantonly and cruelly neglecting to provide for the wife · by the husband, he being of sufficient ability to do so. Other causes have since been added, and our present statutes authorize such divorces for five distinct causes : 1. extreme cruelty; 2. utter desertion; 3. gross and confirmed habits of intoxication contracted after marriage ; 4. cruel and abusive treatment; 5. on the libel of the wife, when the husband, being of sufficient ability, grossly, or wantonly and cruelly refuses or neglects to provide suitable maintenance for her.

The libel in this case alleges the first and fifth causes only ; but the case was tried as if the fourth cause had also been alleged ; and no question is now raised upon the pleadings. We have no occasion to consider the question whether, upon an allegation of "extreme cruelty," the libellant would have a right to offer evidence of "cruel and abusive treatment," if objection were made thereto. The principal question in the present case is whether the jury were correctly instructed as to what constitutes cruelty. The cruelty which the libellant attempted to prove consisted of personal violence, and neglect and refusal to provide for her support. The jury were instructed that no acts or treatment or conduct would be cruel, within the meaning of the statute, which did not cause an injury either to the libellant's life, limb or health, or create a danger of an injury to her life, limb or health, or, at least, create a reasonable apprehension in the libellant of injury to her life, limb or health, upon a continuance of their living together. The term "injury to limb" is

treated in the books as equivalent to the phrase "bodily injury," and is to be so regarded. This construction of the term cruel is very broad, and includes more than personal violence. Undoubtedly the legislature intended that the term cruel and abusive treatment should have a broad construction. Before the statute making such treatment a cause of divorce was enacted, Mr. Justice Dewey had said, in *Pidge* v. *Pidge*, 3 Met. 257, that angry words, coarse and abusive language, or grossly intemperate habits might bring greater sufferings upon a refined and delicate woman than a single act of violence upon her person ; and might well, in the reasonable judgment of the public, authorize her withdrawal from the society of her husband. The English ecclesiastical courts had also adopted a much more comprehensive definition of the term "extreme cruelty" than our court had done in the early cases above cited. The subject has been much discussed in those courts, and the cases are collected and commented upon in Bish. Mar. & Div. *c.* 37, and Shelford Mar. & Div. 425 *et seq.* It may be well to refer to a few of the cases here.

In *Otway* v. *Otway*, 2 Phillim. 95, it was held that cruelty may be without blows ; and if it creates danger to the person or health, that is sufficient. In *Smith* v. *Smith*, Ib. 207, several circumstances are enumerated as constituting cruelty without personal violence. In *Holden* v. *Holden*, 1 Hagg. Con. 458, *sævitia* is defined to be that which tends to bodily harm, and in that manner renders cohabitation unsafe. In *Tomkins* v. *Tomkins*, 1 Swab. & Trist. 148, danger to life, limb or health is said to be the rule ; trifling or temporary pain is not enough, but there must be bodily hurt, or reasonable apprehension of bodily hurt. Blows do not, in all cases, constitute *sævitia.* In Shelford, p. 428, it is said, "A blow between parties in the lower conditions and in the higher stations of life bears a very different aspect. Among the lower classes, blows sometimes pass between married couples who in the main are happy, and have no desire to part. Amidst very coarse habits such incidents occur almost as freely as rude or reproachful words; a word and a blow go together." And in the recent case of *Milford* v. *Mil-*

*ford,* Law Rep. 1 P. & D. 295, the Judge Ordinary held that the violence must be of such a character as to endanger persona<sup>.</sup> health or safety, or there must be reasonable apprehension of it, and that the ground of the court's interference is the wife's safety, and the impossibility of her fulfilling the duties of matrimony in a state of dread.

It is obvious from these authorities that there may be personal violence which does not amount to what is regarded as cruelty; and that there may be cruelty without personal violence. And in every case the character and condition of the parties is to be taken into consideration; and the practical judgment of the court or jury must be exercised in each particular case. It is also to be observed that our statute is not vague, but states with accuracy and care the specific causes for which divorces from bed and board may be granted, and that such indefinite grounds as incompatibility of temper and the like are not mentioned, and are not causes of divorce. It was evidently framed under the influence of such views as were expressed by Lord Stowell in *Evans* v. *Evans,* 1 Hagg. Con. 35. He says: " The general happiness of the married life is secured by its indissolubility When people understand that they must live together, except for a very few reasons known to the law, they have to soften, by mutual accommodation, that yoke which they know they cannot shake off; they become good husbands and wives from the necessity of remaining husbands and wives." And experience has made it manifest that where divorces are easily obtained, and for slight causes, family difficulties more easily arise and are more difficult to settle; the peace and good morals of the community are more exposed to injury; and children are much more exposed to the great and inseparable evils that follow divorces.

Upon consideration of the whole subject, a majority of the court are of opinion that where a divorce is sought on the ground of cruelty, whether it be cruel and abusive treatment, or cruelty in neglecting or refusing to provide suitable maintenance for the wife, a reasonable construction of the statute requires that it shall appear to be, at least, such cruelty as shall cause injury to life, limb or health, or create a danger of such injury

Bailey *v.* Bailey.

or a reasonable apprehension of such danger upon the parties continuing to live together. This is broad enough to include mere words, if they create a reasonable apprehension of personal violence, or tend to wound the feelings to such a degree as to affect the health of the party, or create a reasonable apprehension that it may be affected.

If it be supposed that this interpretation of the statute does not sufficiently provide for a class of cases where, though the abusive language or conduct of one party does not affect the health of the other, yet it makes the life of the other so wretched and intolerable that a divorce ought to be granted on account of the cruelty, we think such supposed cases cannot actually exist. For deeply wounded sensibility and wretchedness of mind can hardly fail to affect the health. And where there is not this evidence of injured feeling, we can see no ground for granting a divorce that is not uncertain and dangerous, and that would not authorize divorces for slighter causes than the legislature apparently contemplated.

The other question reserved relates to the request of the libellant's counsel for instructions based on the assumption that the jury would believe the testimony of the libellant. Several witnesses had testified, and the evidence was somewhat contradictory. A judge is under no obligation to select the testimony of a single witness in a case, and instruct the jury what their verdict should be if the testimony of that witness is true. The request was addressed to his discretion; and no exception lies to his decision in such a case. He had given instructions as to the principles by which the jury were to be guided, and the only point in which they were excepted to has been considered.

*Libel dismissed.*