X. v. X.

(*May* 6, 1946.)

SPEAKMAN, J., sitting.

*William Prickett* for plaintiff.

*Thomas M. Keith* for defendant.

Superior Court for New Castle County, No. 215, September Term, 1945.

SPEAKMAN, J., delivering the opinion of the Court:

The defendant was duly summoned and an appearance was entered for her, by attorney upon the record. She neither appeared in person, or by attorney, at the hearing of the cause.

The parties were married December 16, 1925, and since that date had continued to live in the same home at least, until October 29, 1945. For two or three months prior to that date, they did not occupy the same bed.

The plaintiff, after having testified that during the first seventeen years of his marriage to the defendant she did at all times persistently deny him sexual intercourse, testified that in 1942 "it got to such a stage that I couldn't stand it any longer, and I told Mrs. X something had to be done about it. And I told her that if she didn't go to a doctor and have something done about it, if it was necessary to go to a doctor, that I would leave her and get a divorce. So, she kept stalling, and didn't go, and I finally told her I was going to get out. And she did go to a doctor, and the doctor performed a stretching of her vagina; * * *." He further testified that after his wife returned from the doctor's office she was willing to have sexual intercourse with him. He then proceeded with his testimony as follows: "for a period of about a month everything was normal * * *," then "when I approached her about a month or six weeks, why, she again

refused me. And the time between—that was—the first was a month, then it went on to six weeks, then two months, then three months, and now it has been about eight months." Continuing he said that for eight months prior to October 29, 1945, that being the first day of the hearing in this case, he desired and was able to have intercourse with his wife, but that she was unwilling. As a result of his wife's conduct he said in referring to the period immediately after the marriage, "Being young and healthy, I naturally was very passionate, and with Mrs. X refusing me, although I had to do it, I was forced to get relief by masturbation, and that got on my mind considerably. And I tried to avoid it, but of course, to settle my nerves I had to do something." "I used to get up out of bed three or four o'clock in the morning and take walks; also, get the car out if the weather was bad, and take a ride, and park along the road and try to figure the thing out" and upon return "I generally slept on the davenport in the living room so I wouldn't disturb Mrs. X too much, because on several occasions she complained about me; it was all night and she couldn't get her rest," also "I would walk a lot, and then come home to dinner. I would be there in time for dinner; and if I was able to eat, if I wasn't too nervous, I had my dinner. Of course when I went to bed again that night, I tried to have intercourse and Mrs. X refused me and I had to get away from her and get by myself so I wouldn't be continually upset and not able to—it seemed just like I couldn't go on." He was asked to tell about the walks and what he meant by some distance, to which he replied "Well, depending on the weather, sometimes it was half an hour, sometimes an hour and a half, 1 just walked until I became exhausted and returned to the apartment; and was sometimes able to go to sleep, and others I stayed awake and tried to read until I got sleepy." He said he would try to read until "four or five o'clock in the morning, daybreak sometimes" and that the walking,

and reading, and getting up, and sleeping in the livingroom continued down to the time of the commencement of this proceeding. He also testified as to the effect of his wife's refusal of intercourse after she returned from the doctor. He said, "Well I had to have relations and of course, I reverted to masturbation again for relief." He was then asked "What was the result of this situation on you, that is, you personally; not what you did, but how you felt?" to which he replied, "Well, I became very nervous, as I said, and eventually I went to * * * [a doctor] ; and I didn't tell him what I thought was the cause of it; and he gave me a prescription and it didn't seem to help much. So I went back, and he said that 'I understand you and Mrs. X are separated.' I was surprised that he knew anything about it. We weren't separated; I told him so. I became very nervous and upset in his office and had a nervous breakdown." In answer to the question "What do you mean by a nervous breakdown?" he said, "I couldn't control myself; I broke down and cried very much; and very, very nervous." He further testified that he had other crying fits and that so far as he knew there was nothing whatever to which he would attribute his nervous condition except the situation with his wife.

Continuing with his testimony he said that up until 1936 he worked for one company, first as a shipping clerk and finally as vice-president and sales-manager for the local distribution of its products; from 1936 to 1942 or 43 he was engaged in business in Wilmington, on his own account; in 1942 he took a public position, executive in character, that he had been commended for his work, had recently received a promotion, and had fifteen people working with him; he had received several offers of positions, but did not feel he should leave his present position until his work is finished,

and he had no apprehension or nervousness about his future when his present work is ended.

With respect to his health he testified as follows:

"Q. With the exception of your nervousness * * * how is your health? A. Very good.

"Q. Have you had any troubles that are really serious? A. None whatever.

"Q. Did you mention sinuses to me? A. Well, I have no trouble, you might say, with sinuses, outside of when I have cold there is a slight discharge. It doesn't annoy me too much. It is very minor. I have never been to a doctor at all about it.

"Q. Is it painful? A. Oh, no.

"Q. Do you have hay fever? A. I have hay fever, yes.

"Q. Have you lost any time from your work from that? A. No, the hay fever doesn't bother me. I am taking injections for it, and it has proved very satisfactory.

"Q. Are there any other things, even of a minor nature about your health that bother you? A. Mr. Prickett, I don't know of a thing. * * *

"Q. How about your health? A. Very fine, very good health."

He further testified that his finances were, and always had been, in perfectly good condition; that when he was in business for himself, he was very successful; that his parents are living, are not dependent on him for support, and are in very good shape financially.

A physician called as a witness was asked two questions, based upon a hypothetical statement of facts. The state-

ment represented, in its enumeration of facts, the essential testimony of the plaintiff in support of the allegations of extreme cruelty and the resulting effect, although not as fully as above set out, but with substantial correctness. He was asked: Assuming that these facts are true, is it your opinion that the conduct of the defendant which I have described is the direct cause of the nervous condition of which the plaintiff complains? To which he replied, "Yes, that would be my opinion." The second question, "You consider that the situation is such as to threaten or endanger the plaintiff's health?" His answer to this question was "Yes."

The physician further testified that the petitioner was a patient of his, and that he remembered the occasion when the plaintiff was in his office, and as he described it, had a nervous breakdown. In referring to the incident, the witness testified as follows: "Well, he explained the details of his difficulties, as we have recited before: and he was very much upset. He said that he felt that he had tried his best, and that the whole situation was more than he could continue to endure: that his nerves were, as he put it, shot to pieces: he couldn't do the things—his work that he was supposed to do; he was very shaky and jumpy, and while he was reciting it he actua'ly broke down and cried in the office, and intimated to me that he was not used to such an emotional reaction, but that it had become more frequent lately, he didn't seem able to control himself. I don't remember the exact date, but that was, as near as I can recollect, what happened."

Another physician who, according to the petitioner's testimony performed a stretching of the defendant's vagina, testified in effect that he had known the defendant since 1932 or 1933, that she was a patient of his prior to 1942, that he was in the Army from August, 1942, to No-

vember 15, 1945, that when he entered the Army his records were delivered to other physicians, that he was unable to locate the records of the defendant, and that he had no recollection of stretching the defendant's vagina in 1942, or thereabouts. He was asked this hypothetical question, which was fully justified under the evidence:

"Mr. and Mrs. X had been married for 17 years before the summer of 1942. During that time they had never had intercourse. Mrs. X went to you—went to a doctor, and had her vaginal canal dilated. After that Mrs. X was willing to have sexual intercourse with Mr. X for a period of about a month with normal frequency. After that she was unwilling to have intercourse for about a month, and then after that for a period of six weeks and longer and longer until at the time of the first hearing, which was some months ago, she had refused to have intercourse with Mr. X for 8 months. Bearing in mind and assuming that those facts are true, is it your opinion that Mrs. X had incurable physical incapacity for copulation?" to which the witness replied "If she was able to have intercourse for a period of one month. I should think that that woman would have had capacity for intercourse."

The question before the court is whether a wilful refusal of reasonable sexual intercourse has been shown, and if so, whether the resulting effect on the plaintiff, as proved in this case, is sufficient to warrant the entry of a decree of divorce on the ground of extreme cruelty, within the meaning of our law. So far as our reports show, no divorce has ever been granted by the courts of this state on the ground of extreme cruelty, in the absence of some showing of personal violence, or a reasonable apprehension of such violence.

In *McClenahan v. McClenahan*, (1911), 2 *Boyce* (25 *Del.*) 599, 80 *A.* 677, 683, the question presented was whether

a divorce could be decreed for extreme cruelty, based on the ground that the husband was guilty of dishonesty and fraud toward his creditors by issuing to them worthless checks and of making false representations to his wife as to his debts, causing his wife great physical and mental suffering in consequence of such acts. The court found that the allegations in the petition were substantially proved at the trial, and held that the facts proved did not establish extreme cruelty within the meaning of the statute.

The court in seeking the meaning of the term extreme cruelty relied largely on Mr. Bishop's work on Marriage, Divorce and Separation, in which the cases in the English ecclesiastical courts are collected and commented upon. Mr. Bishop says that *Evans v. Evans,* 1 *Hag.Con.* 35, 161 *Eng. Reprint* 466, decided by Lord Stowell in 1790, "has always been regarded as the leading authority on this subject, approvingly commented upon in almost every subsequent decision, English or American." In his opinion Lord Stowell said, "What merely wounds the mental feelings is in few cases to be admitted, where not accompanied with bodily injury, either actual or menaced." He further said, "But if it were at all necessary to lay down an affirmative rule, I take it that the rule cited by Dr. Bever from Clarke, and the other books of practice, is a good general outline of the canon law, the law of this country, upon this subject. In the older cases of this sort, which I have had an opportunity of looking into, I have observed that the danger of life, limb or health is usually inserted as the ground upon which the court has proceeded to a separation. This doctrine has been repeatedly applied by the courts in the cases that have been cited. The court has never been driven off this ground. It has been always jealous of the inconvenience of departing from it, and I have heard no one case cited in which the court has granted a divorce without proof given of a reason-

able apprehension of bodily hurt. I say an apprehension, because assuredly the court is not to wait till the hurt is actually done; but the apprehension must be reasonable; it must not be an apprehension arising merely from an exquisite and diseased sensibility of the mind." In the course of his opinion, Chief Justice Pennewill, speaking for the court, said in reference to the opinion in the Evans case, "This exposition of the law by Lord Stowell in the main commends itself very strongly to our minds as conservative, sound and safe." Continuing, he said: "No divorce has been heretofore granted in this state on the ground of extreme cruelty under our statute, unless personal violence, or some revolting act equivalent thereto was shown, or a reasonable apprehension that such violence would be inflicted. We do not say that there may not be a case of mental anguish and pain, caused intentionally, consciously and directly by one of the parties to the marriage relation, and of such character and extent as to endanger the life or health of the other, or render cohabitation unsafe, and thereby justify a divorce. But such a case is not now before us, and we express no opinion thereon."

Bishop says that "In England and some of our states, the doctrine to which not an exception could easily be found, is abundantly established that the apprehended harm must be bodily, including detriment to health, in distinction from what is endured only by the mind, or mere mental suffering. And the explanation seems to be that in cases of mental pain and suffering 'the court has no scale of sensibilities by which it can gauge the quantum of injury done and felt.'" 1 Bishop, supra, Sec. 1548.

In the McClenahan case, the Chief Justice stated that "The provision [respecting cruelty] in the Delaware law is as strict and exacting as can be found in any state." It is undoubtedly true that the language in our statute is

just as strict and exacting as the meaning given to the word cruelty by the English ecclesiastical courts. Our first law giving jurisdiction to the courts in causes of divorce was passed by the General Assembly on February 3, 1832, and is published as Chapter CLXI of Volume 8 of our Laws. Under this law one of the causes for divorce was "extreme cruelty." This term continued as a cause for divorce until March 29, 1907, when by Act approved on that date, Chap. 221, Vol. 24, the term was changed so as to read "extreme cruelty on the part of either party such as to endanger the life or health of the other party or to render cohabitation unsafe," and this language has remained unchanged down to the present time. It seems to me that the language "such as to endanger the life or health" in the Delaware law is substantially the same as "danger of life, limb or health," which Lord Stowell said, in the Evans case, is "usually inserted as the ground upon which the court has proceeded to a separation as an affirmative rule defining cruelty, consequently, I have no question but that the legislature in providing that extreme cruelty should be a ground for divorce, intended to use the words in the same sense in which the word cruelty was always used in like proceedings in the English courts prior to the separation."

In at least seventeen states, exclusive of Delaware, the courts have considered the refusal of sexual intercourse as justifying or not justifying a divorce on the ground of cruelty. As might be expected, neither the language of the statutes nor the decisions are uniform in these States. At the expense of brevity, reference will be made to the statutes and the holding of the courts in these states.

In 3 *Schouler on Marriage, Divorce, Separation and Domestic Relations*, 6th *Ed.* (1921) the language of the provision in the statutes of those states authorizing a decree of divorce on the ground of cruelty is given. In the 1945 com-

pilation by Indovina and Dalton (Law Publishing Co., Santa Monica, Cal., publishers) of the *Statutes on Marriage, Annulment and Divorce,* it appears that said statutory provisions are substantially the same as in Schouler. I have not the books available for the purpose of determining with certainty to what extent the provisions were the same prior to 1921, and whether between 1921 and 1945 they continued unchanged. In most instances, in the cases which I shall refer to, the statutory cause which is relied on appears in the report and is in accord with the language in Schouler. Where it is otherwise, that fact will be noted.

Of those states in which the courts have had occasion to consider the refusal of sexual intercourse as cruelty within the meaning of the statutory language, the term used in the statute in six of them, as shown in 3 Schouler, supra, is "extreme cruelty." These states consist of California, Florida, Maine, Michigan, New Jersey and Ohio.

In *Prall v. Prall,* (1909) 58 *Fla.* 496, 50 *So.* 867, 868, 26 *L. R. A. (N. S.)* 577, it was charged that the wife "refused to * * * allow complainant the privileges of a husband," that this state of affairs continued for more than one year and constituted "extreme cruelty" and "that the several matters herein charged so preyed upon complainant's mind that he became sick and discouraged with life." Upon demurrer the court held "mere inconvenience, unhappiness, or incompatibility of temperament or disposition, rendering the marriage relation between the parties disagreeable or even burdensome, will not authorize a decree of divorce for extreme cruelty."

In *Currie v. Currie,* (1935) 120 *Fla.* 28, 162 *So.* 152, 154, the complainant sought a divorce on the ground of "extreme cruelty." On appeal from a decree of divorce the court said, "the evidence in the case now before us makes out more than

a mere instance of a husband's refusal to have sexual intercourse with his wife as argued by the appellant, who seeks reversal of the decree on the authority of *Prall v. Prall,* 58 *Fla.* 496, 50 *So.* 867, 26 *L. R. A. (N. S.)* 577, for legal insufficiency of the proof to support the decree of divorce as a matter of law" the court then detailed the facts as they appeared in the case before it showing marital misconduct and omissions, including the defendant's refusal for a period of about five years to have any sexual intercourse with his wife.

In *Holyoke v. Holyoke,* (1886) 78 *Me.* 404, 6 *A.* 827, 829, the libelant sought a divorce upon the ground of "extreme cruelty." The case came up on demurrer to the libel. It charged several acts as ground for divorce, including the charge that "the libelee has for a long time refused her bed to the libelant * * * whereby his peace of mind has become so affected as to endanger his health." The court was of the opinion that no allegation in the libel had been held to constitute legal cruelty.

In *Gilson v. Gilson,* (1933) 113 *N. J. Eq.* 32, 166 *A.* 111, the wife brought a suit based on the grounds of desertion and extreme cruelty. The husband denied the charges and counterclaimed alleging extreme cruelty on the part of the wife, one of the allegations being the wife's "refusal to have sexual intercourse with him, commencing June 28, 1931." As the result of the alleged cruelty he charged "that his health became shattered and he was rendered unfit to earn a livelihood, etc." In the case the court followed *Wood v. Wood,* 97 *N. J. Eq.* 1, 128 *A.* 418, in which the Chancellor, speaking for the Court of Chancery, held that the refusal of sexual relations is not cruelty, but is simple desertion.

It appears in 3 Schouler and the Indovine and Dalton compilation, *supra,* and in Gen. Code 1921, § 11979, "extreme cruelty" is shown as one of the causes for absolute

divorce in Ohio. I have not the means available for determining whether at the time of the hearing in the case the words in the statute were as shown above, viz., "extreme cruelty." In *McKinney v. McKinney*, (1900) 9 *Ohio Dec.* 655, 7 *Ohio N. P.* 259, the plaintiff charged that the defendant had been guilty of gross neglect of duty in that she refused to consummate said marriage, or cohabit with plaintiff, or perform any of her marital duties. It does not appear from the report that there was any charge that the plaintiff's health was affected, either bodily or mentally, by reason of the defendant's alleged conduct. The court held that the refusal of sexual intercourse "is not a ground for divorce under the head of 'gross neglect of duty' or 'wilful absence,' as has been held in Illinois, Maine and Massachusetts; and neither is it 'cruelty' on account of such refusal as has been held by the courts of Wisconsin."

A different view has been taken by the courts in the other two states.

In *Campbell v. Campbell*, (1907) 149 *Mich.* 147, 112 *N. W.* 481, 119 *Am. St. Rep.* 660, the bill of complaint charged "extreme cruelty." The court said: "Some of the alleged acts of cruelty are explained by the defendant, but the record discloses that for three years defendant refused to cohabit with complainant. * * * Refusal of cohabitation has repeatedly been held to be a ground for divorce," citing two Michigan cases.

In *Ritter v. Ritter*, (1930) 103 *Cal. App.* 583, 284 *P.* 950, 952, one of the causes set up was "extreme cruelty." On appeal by the defendant from an interlocutory judgment of divorce, it was held that the lower court did not find that the defendant's refusal to have sexual intercourse was without just cause. In reversing the interlocutory judgment, the court said, "To support a judgment for divorce upon the ground of extreme cruelty, it is essential that the court find

that the conduct characterized by the findings as cruel, 'wrongfully inflicted upon the (innocent party) grievous bodily injury or grievous mental suffering, or both' * * * this is so because the injury or suffering is the ultimate fact entitling the injured party to a severance of the marital ties." "The other omissions above noted are equally fatal. A refusal of intercourse can be regarded as cruelty only when without just or proper cause, and when the health and bodily condition of *both* spouses would justify such intercourse."

In Georgia it appears from 3 Schouler, *supra,* that a divorce from bed and board may be granted "on any ground which was held sufficient in the English courts prior to May 4, 1784." In the Indovina and Dalton compilation it appears that in this state "Divorce from bed and board may be granted on any ground recognized by the common law, to-wit: Adultery and 'cruel treatment.' " In *Pinnebad v. Pinnebad,* (1910) 134 *Ga.* 496, 68 *S. E.* 73, reported without opinion, but in the syllabus by the court it is stated that "mere proof that a wife declined to cohabit with her husband will not authorize the grant of a divorce to him on the ground of cruel treatment."

In Massachusetts, as shown in 3 Schouler, *supra,* one of the grounds for divorce is "Cruel and abusive treatment." In *Cowles v. Cowles,* (1873) 112 *Mass.* 298, the court held that a wife's utter denial of sexual intercourse is not "cruel and abusive treatment" entitling the husband to a divorce. It said, "Such conduct is not to be regarded, within a reasonable interpretation of the provisions of St. 1870, c. 404, §2, as cruel and abusive treatment. Under the like provision of Gen. Sts. c. 107, § 9, it has been held that the cruelty charged must appear to be such 'as shall cause injury to life, limb or health, or create a danger of such injury, or a reasonable apprehension of such danger.' " Citing *Bailey v. Bailey,*

97 *Mass.* 373; *Peabody v. Peabody,* 104 *Mass.* 195; *Southwick v. Southwick,* 97 *Mass.* 327, 93 *Am. Dec.* 95.

In five states, namely Indiana, Mississippi, Oregon, West Virginia and Wisconsin, the pertinent term used in the statutes is as shown in 3 Schouler, *supra,* "cruel and inhuman treatment." In Mississippi the term is qualified by the word "habitual."

In *Schoren v. Schoren,* (1923) 110 *Or.* 272, 214 *P.* 885, 888, reversed and on rehearing affirmed, 110 Or. 272, 222 P. 1096, the court said that "by the weight of authority, the refusal of one of the parties to a marriage contract to cohabit with the other is not legal cruelty. It has often been held that desertion does not constitute cruelty. * * * Plaintiff's testimony tended to prove desertion, and nothing more." Proceeding, the court said, "The general rule is that, in the absence of proof that the health of the complaining spouse is either injured or threatened, the refusal of the other to cohabit is not legal cruelty." Citing 19 *C. J.* 56. See, also, 27 *C. J. S., Divorce,* § 32.

In *Wills v. Wills,* (1914) 74 *W. Va.* 709, 82 *S. E.* 1092, *L. R. A.* 1915B, 770, it does not appear in the report of the case that it was contended by the plaintiff that his wife's alleged conduct impaired or threatened to impair his health. The court held that nonintercourse, although the same can be regarded as not justified by the physical condition of the wife, does not constitute ground for divorce. See also *Roush v. Roush,* (1922) 90 *W. Va.* 491, 111 *S. E.* 334.

In *Sarphie v. Sarphie,* (1937) 180 *Miss.* 313, 177 *So.* 358, the plaintiff sought a decree on the ground of cruel and inhuman treatment. It was charged that the successful refusal of intercourse to the husband had produced "a highly nervous state and indigestion, thereby injuring him and causing apprehension to him of danger to his mental and

physical health." The court said, "to make out a case, the facts should present an inexcusable and long-continued refusal to permit coition, and that the case should be, at all events, a clearly extreme one."

In *Foster v. Foster,* (1923) 79 *Ind. App.* 345, 138 *N. E.* 360, 361, in affirming the judgment of the court below, in denying a decree the court said, "there is no evidence of distress of mind whatever. Also, there is no evidence as to the physical condition, or health of the appellee at the time in question, or as to the physical condition of the appellant."

In Wisconsin two of the grounds for divorce, as shown in 3 Schouler, *supra,* are: 1. From the bonds of matrimony, where the treatment of the wife by the husband has been cruel and inhuman, whether practiced by personal violence or any other means, or where the wife shall be guilty of like cruelty by the husband, and 2. From bed and board, extreme cruelty. It therefore follows that under its divorce law the two grounds are not to be considered as synonymous, and of the two extreme cruelty should be considered as the less serious. In *Schoessow v. Schoessow,* (1892) 83 *Wis.* 553, 53 *N. W.* 856, it was held that the mere refusal of sexual intercourse is not cruel and inhuman treatment, provided that no mental or bodily harm and no impairment of health results from such refusal.

In Pennsylvania the law, as shown in the Indovina and Dalton compilation, provided for a divorce when any spouse "shall have, by cruel and barbarous treatment, endangered the life of the injured and innocent spouse." In Appeal of Klopfer (1888), 1 Monag. (Pa.) 81, it was held that failure to have sexual intercourse is not ground for divorce, citing *Eshback v. Eshback,* (1854) 23 *Pa.* 343. See also *Johnson v. Johnson,* (1906) 31 *Pa. Super.* 53, and *Platt v. Platt,* (1909) 38 *Pa. Super.* 551.

In *McCurry v. McCurry,* (1939) 126 *Conn.* 175, 10 *A.* 2d 365, the court held that a wife's refusal to have sexual intercourse for six years during which she lived with her husband was not "intolerable cruelty" within the meaning of the statute, and in *Van Gilder v. Van Gilder,* (1923) 100 *Conn.* 1, 122 *A.* 719, 720, the court said, "there must not only be proof of acts of cruelty * * *, but proof that in their cumulative effect upon the plaintiff they are intolerable in the sense of rendering the continuance of the marital relation unbearable by him."

In Texas one of the causes for divorce, as shown in 3 Schouler, *supra,* is "Where either party is guilty of excesses, cruel treatment or outrages toward the other, if such ill treatment is of such a nature as to make their living together insupportable." In *Varner v. Varner,* (1904) 35 *Tex. Civ. App.* 381, 80 *S. W.* 386, the specific ground charged does not appear. There the court held that a mere persistent refusal by the plaintiff's wife to permit sexual intercourse is not sufficient to establish a right to divorce under the statute without showing that because of the physical condition of the husband, such refusal amounted to the cruelty described.

The case of *Nordlund v. Nordlund,* (1917) 97 *Wash.* 475, 166 *P.* 795, 799, *L. R. A.* 1918A, 59, has frequently been cited as an authority in support of the proposition that a spouse's long continued and injustifiable refusal of intercourse may constitute cruelty. In this case there was a denial for twelve years. The court said, "Our statute (Rem. Code 1915, § 982) upon which our conclusions must be reached, differs from those * * * upon which divorces upon this ground have been denied. It recites that a divorce may be granted upon the following cause: 'Cruel treatment of either party by the other, or personal indignities rendering life burdensome. * * * And a divorce may be granted upon application of either party for any other cause deemed sufficient,

and the court shall be satisfied that the parties can no longer live together.' Under this statute we have no hesitancy in saying that respondent's denial of sexual intercourse for 12 years without sufficient ground or cause is ground for divorce."

In *Gibson v. Gibson*, (1912) 67 *Wash.* 474, 122 *P.* 15, which has also been cited for the same purpose, the finding of the court was in part that it was impossible for the parties "to longer live together as husband and wife."

Exclusive of the courts in Delaware and in the above states, few if any courts, as shown by the reported cases, have had occasion to consider the refusal of marital intercourse as justifying a decree of divorce on the grounds of cruelty. I believe that the reason for this, at least to some extent, is because by the great weight of authority the denial of such intercourse is either a cause for divorce on the ground of desertion or it is a material circumstance to be considered with other material facts as constituting either desertion or abandonment. Some of the pertinent cases are *Fleegle v. Fleegle*, 136 *Md.* 630, 110 *A.* 889; *Parmly v. Parmly*, 90 *N. J. Eq.* 490, 106 *A.* 456; *Axton v. Axton*, 182 *Ky.* 286, 206 *S. W.* 480; *Graves v. Graves*, 88 *Miss.* 677, 41 *So.* 384; *Whitfield v. Whitfield,* 89 *Ga.* 471, 15 *S. E.* 543; *Stein v. Stein*, 5 *Colo.* 55; *Schoren v. Schoren*, 110 *Or.* 272, 214 *P.* 885, 222 *P.* 1096; *Jones v. Jones*, 172 *Va.* 14, 199 *S. E.* 510; *Perine v. Perine*, 92 *W. Va.* 530, 114 *S. E.* 871; *Thomas v. Thomas*, 233 *Ala.* 416, 172 *So.* 282; and in this state *Reppert v. Reppert*, 1 *Terry* (40 *Del.*) 492, 13 *A.* 2d 705.

Of the cases above referred to as having considered the denial of marital intercourse as cruelty, it is apparent that the meaning of the pertinent language used in the divorce laws of Connecticut, of Texas, as shown in Schouler, and of Washington is so materially different from the language in the Delaware statute that the cases in those states cannot be

considered as authorities in the instant case. Whatever may be said about the interpretation of the language used in the statutes in the other states and the conflict in the authorities in their courts, it is a fact that the final results reached in most of them are not inconsistent with the rule adopted by the early English ecclesiastical courts, and this is particularly so where the term used in the statute is "extreme cruelty."

In arriving at my conclusion in the case before me, I do not feel at liberty to disregard the approval of this court in *McClenahan v. McClenahan, supra,* of the rule as expressed by Lord Stowell in the Evans case. In that case Lord Stowe l said, "mere austerity of temper, petulance of manners, rudeness of language, a want of civil attention and accommodation, even sallies of passion, if they do not threaten bodily harm do not amount to legal cruelty." In principle, I cannot distinguish these from many other acts of conduct of one spouse which would be calculated to disrupt the marital relation to such an extent as to cause mental suffering by the other spouse, such, as for instance, infidelity, intoxication and idleness, and in this I would include the denial of marital intercourse.

If this court is to depart from the rule of the early English ecclesiastical courts, then it seems to me that in those cases where there is an absence of physical violence and the conduct of one spouse is such as to produce mental suffering to the other spouse, the important thing in considering whether the conduct amounts to extreme cruelty, is not the cause of the suffering, but the effect thereof on the innocent spouse. In the present case there is a complete absence of evidence showing that the wife's conduct caused the plaintiff any physical hurt, or that it created any apprehension of such hurt. Regarding mental suffering, I do not question the opinion of the physician who was called as a

witness, that such a situation as described in the hypothetical statement of facts was directly caused by the defendant's conduct, and that the situation was such as to threaten or endanger the plaintiff's health. Independent of his testimony, I had no difficulty in arriving at the same conclusion, but in saying this I do not wish to be misunderstood. Worry or mental suffering sufficient to endanger, to some extent, the health of a spouse occasioned by the conduct of the other spouse is prevalent in many married lives, but that of itself would not be a cause for divorce on the ground of extreme cruelty within the meaning of our statute. In the present case the conduct of the wife about which the plaintiff complains, covered a period of about twenty years excepting for a short interval during that period. The plaintiff by his own testimony negated the charge in his petition that his wife had been guilty of extreme cruelty on her part such as to endanger his health. Notwithstanding the mental suffering he testified he endured during his married life and prior to the hearing, he enjoyed during that time excellent health and had a successful business career. It cannot be inferred from the evidence that the situation in the future will be materially different from that in the past.

The plaintiff in support of his contentions relies solely on *A. v. A.*, 3 *Terry* (42 *Del.*) 605, 43 *A.* 2d 251, as he has not referred to any other case. There a divorce was sought on the ground of extreme cruelty. The plaintiff charges that there was a denial of marital intercourse on the part of the defendant for a period of five years and that, by reason thereof, "she has become irritable, that she suffers from insomnia, and that her nerves have completely broken." The court was of the opinion that a divorce might be granted based upon extreme cruelty where it had been shown that the denial of marital intercourse had caused injury to the plaintiff either mentally or bodily, and where it was estab-

lished that her life or health had been endangered thereby, provided that the mental anguish or suffering complained of be found to be the sole and direct result of the denial and not merely a contributory cause thereof, and that the suffering be of such consequence that in fact it must be said that the life or health of the offended party had been endangered thereby. In the case the court found that the denial of marital intercourse on the part of the husband "was merely a contributing cause of her present condition, and, since it was not the sole and direct cause thereof, the prayer of the plaintiff's petition for divorce must be denied." Surely, this case is not an authority in support of the proposition that a divorce will be granted on the ground of "extreme cruelty" where nothing more is shown than in the case before me.

I have extreme doubt as to whether the refusal of the defendant to submit to sexual intercourse was wilful and without just cause, because of the testimony concerning the stretching of the defendant's vagina, but a determination of that question is not necessary, for the reason that in this case the plaintiff has failed to sustain his charge that the defendant's conduct was such as to endanger his health to the extent necessary to establish extreme cruelty within the meaning of our statute. A decree will be entered denying the prayer of the plaintiff's petition.