HARRY A. SYLVESTER *vs.* RITA R. SYLVESTER.

Barnstable. April 8, 1953. — July 7, 1953.

Present: QUA, C.J., LUMMUS, WILKINS, WILLIAMS, & COUNIHAN, JJ.

*Divorce,* Jurisdiction, Cruel and abusive treatment, Motion to dismiss, Plea. *Domicil. Jurisdiction,* Divorce proceedings.

A motion to dismiss a divorce libel for want of jurisdiction was treated by this court as a plea. [398]

Evidence in a divorce proceeding by a husband showing residence of the parties together in a Massachusetts town, located in the county where the proceeding was brought, for some years until, a few months before the filing of the libel, they moved with their children to another State where the husband had obtained employment, together with evidence of his domiciliary intent through his continued payment of income taxes in Massachusetts and voting in such town thereafter and testimony by him that he considered the town to be his home and intended to return there, would warrant findings that he had established a domicil in the town and had not changed it by moving to the other State and supported a ruling that the court had jurisdiction of the proceeding. [398–399]

A finding of cruel and abusive treatment of a husband by his wife sufficient to support a libel for divorce by him was not justified by his testimony that "stemming" from publication of a book written by him and objected to by her there were "serious difficulties" and "a continued series of arguments"; that there were "almost continual quarrels"; that he "came to realize," not from "anything . . . [she] stated," that she "was doing everything in her power

to prevent" him from pursuing his living as a writer; that he was "affected . . . mentally to the extent that" he was unable to do his work as he had previously and suffered a decline in income; that at times and in circumstances not shown she "hit" him and on one occasion "kicked" him; and that, at a time more than a year before the parties separated, she "in a rage" slammed a door and then "approached . . . [him] and tore the sleeves out of . . . [his] shirt." [399–402]

LIBEL for divorce, filed in the Probate Court for the county of Barnstable on February 25, 1952.

The case was heard by *Campbell*, J.

*Kenneth E. Wilson*, for the libellee.

*Edmund Burke & John Christoforo*, for the libellant, submitted a brief.

WILLIAMS, J. This is a libel for divorce dated February 11, 1952, and filed in the Probate Court for the county of Barnstable on February 25, 1952, alleging that the libellee at Brewster on the first day of August, 1950, and on divers other occasions was guilty of cruel and abusive treatment toward the libellant. The case is here on the appeal of the libellee from a decree granting the divorce. While the evidence is reported, there are no findings of fact.

The questions for decision concern the jurisdiction of the trial court and the sufficiency of the evidence to support the decree. The issue of jurisdiction was raised by the libellee's motion to dismiss the libel for "want of jurisdiction" which we treat as a plea. *Cochrane* v. *Cochrane*, 303 Mass. 467. *Lyon* v. *Lyon*, 318 Mass. 646.

There was evidence that the parties were married on January 18, 1936, in New York city. Thereafter they lived in Provincetown and Wellfleet until 1938, when they left Massachusetts, returning in 1942. In 1946 a house was purchased in Brewster in which they lived until 1951. Title to the house was taken in the name of the libellee but in 1948 or 1949 it was transferred to the libellant. The libellant was a magazine writer and has had four novels published. In May, 1951, he obtained employment with the "Voice of America" with headquarters in New York city and in September of that year moved with his family con-

sisting of his wife and four children to Upper Nyack, New York. They lived there in a leased house until January, 1952, when the libellant left his family and went to New York city. The libellee and the children continued to live in Upper Nyack. The libellant testified that although he works in New York he "commutes" to Brewster. He sold the Brewster house in May, 1952, but considers Brewster to be his home and intends to move back there. Since living on "the Cape" he has never voted anywhere except in Massachusetts and voted in the Brewster town election in 1952. He has paid income taxes in Massachusetts for ten years and filed a tax return in 1952. On this evidence there was no error in the ruling of the judge that he had jurisdiction to hear the libel. The jurisdiction of the court to grant a divorce depended upon the domicil within the State of at least one of the parties. *Royal* v. *Royal*, 324 Mass. 613, 617, and cases cited. A libel may be filed, heard, and determined in the Probate Court for the county where one of the parties lives, G. L. (Ter. Ed.) c. 208, § 6, if before the cause of divorce occurred the parties had lived together as husband and wife in this Commonwealth and one of them lived here when the cause occurred (§ 4). It appeared that, except for the interval from 1938 to 1942, the parties lived in Barnstable County from the time of their marriage until 1951 when they moved to Upper Nyack. It could be found that the libellant had established a domicil in Brewster; that the change of residence to Upper Nyack was for the purpose of living near where the libellant had obtained temporary work; and that there was no intention to leave Brewster permanently or to establish a new domicil. See *Tuells* v. *Flint*, 283 Mass. 106; *Kennedy* v. *Simmons*, 308 Mass. 431, 435. The continuing payment of taxes and the exercise of the voting privilege were some evidence of the libellant's intent. *Todd* v. *Foster*, 328 Mass. 136, 139.

At the hearing on the merits the libellant testified that on or about August 1, 1950, "Mrs. Sylvester in a rage slammed the kitchen door and broke the glass. I remonstrated with her not to do such things in front of the children and she

approached me and tore the sleeves out of my shirt"; that "serious difficulties happened in 1947 and stemming as I came to understand from the publication of a book of mine"; "that Mrs. Sylvester objected to the book . . . [which] was part of the difficulty"; that "It wasn't anything Mrs. Sylvester stated, but over the course of four years I began to realize that she was doing everything in her power to prevent me from pursuing my employment, where I made my entire living and my entire income, it was a very grievous thing for me to realize, but I came to realize this was so"; and that there were "almost continual quarrels . . . it affected me mentally to the extent that I was unable to do my work as I had done it for many years and my income dropped in a matter of three or four years from about $12,000 in one year to less than $4,000." In cross-examination he testified that the incident of August 1, 1950, "was the result of a continued series of arguments which stemmed back . . . to a book I wrote." In reply to the question, "During the entire course of your married life your wife never hit you, did she?" he answered, "She did . . . in fact, on one occasion she kicked me."

The term cruel and abusive treatment "is broad enough to include mere words, if they . . . tend to wound the feelings to such a degree as to affect the health of the party." *Bailey* v. *Bailey*, 97 Mass. 373, 380–381. *Freeman* v. *Freeman*, 238 Mass. 150, 160. *Rudnick* v. *Rudnick*, 288 Mass. 256, 257. In *Freeborn* v. *Freeborn*, 168 Mass. 50, a school teacher was so persistently nagged by his wife that he was affected nervously and his health was disturbed. It was held that a decree for divorce in the libellant's favor was not required as matter of law, although the court said, "No doubt there may be such an habitual or frequent use of exasperating language as to warrant the granting of a divorce when injury to health follows" (page 52). In *Armstrong* v. *Armstrong*, 229 Mass. 592, a wife's health was impaired by the knowledge that her husband was associating with another woman. In holding that it was not error to dismiss the libel the court said, "A spouse may be guilty

of drunkenness or other vices; his habits or disposition, his indifference, neglect, or desertion may cause mental worry and injury to his wife's health; but these acts standing by themselves are not enough to make out a case of cruel and abusive treatment. . . . Neither words nor acts which do not involve physical violence, inflicted on the other party, are sufficient to constitute cruel and abusive treatment within the meaning of the statute, unless it is shown that the language was uttered or these acts were committed with a malicious intent and for the purpose of injuring the libellant" (page 594). See W—— v. W——, 141 Mass. 495; *Reddington* v. *Reddington,* 317 Mass. 760, 765. The importance of motive in the case of conjugal misconduct which falls short of physical violence is illustrated by a comparison of the *Armstrong* case with *Curtiss* v. *Curtiss,* 243 Mass. 51, where it was held that a decree of divorce should have been granted where the husband with intent to obtain a separation from his wife told her of his preference for another woman, thereby causing her mental suffering which affected her health. See *Turner* v. *Turner,* 234 Mass. 37. In *Brown* v. *Brown,* 323 Mass. 332, persistent misconduct of a wife with her father in circumstances from which an intent to injure the husband was inferable was held to require the granting of a divorce.

In the instant case there was no evidence of acts and declarations of the libellee from which a malicious or unjustifiable purpose to injure the libellant could be inferred. See *Thayer* v. *Thayer,* 101 Mass. 111, 113; *Plumer* v. *Luce,* 310 Mass. 789, 800. The evidence on that point consisted mainly of the libellant's conclusions. He testified that his wife objected to the publication of a book which he had written; that "stemming" from that publication there were "serious difficulties" in 1947; that there were "continual quarrels"; and that, although not because of "anything . . . [she] stated," he "began to realize that she was doing everything in her power to prevent . . . [him] from pursuing . . . [his] employment." It did not appear that her

objection to the character of her husband's literary production was not justified or that she was responsible for the ensuing "difficulties" and quarrels.  The instances of the use of physical force seem to have been sporadic and no part of an intentional course of conduct.  Except as to August 1, 1950, no dates of the alleged incidents were given and no descriptions of the attending circumstances from which it could be determined that blame was attributable to the libellee.  After August, 1950, the parties lived together until January, 1952.  Although this fact did not require a finding of condonation (see *Quigley* v. *Quigley*, 310 Mass. 415, 417–418) it suggests that the libellant then regarded as trivial the behavior of which he now complains.  We think that the evidence did not justify a finding that the conduct of the libellee was cruel and abusive within the statutory meaning of those terms.  *Vergnani* v. *Vergnani*, 321 Mass. 703.    *Hamilton* v. *Hamilton*, 325 Mass. 278.    Compare *Quigley* v. *Quigley, supra.*

The decree should be reversed and a decree entered dismissing the libel.  Costs and expenses of this appeal may be allowed to the libellee or her counsel in the discretion of the Probate Court.  G. L. (Ter. Ed.) c. 208, § 38, as appearing in St. 1933, c. 288.

*So ordered.*